**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

MUELLER BRASS CO.,

     Plaintiff/Counter-Defendant,

v.

DAVID CROMPTON,

     Defendant/Counter-Plaintiff.

No. 2:20-cv-02496-SHL-cgc
**JURY DEMANDED**

----------------------------------------------

DAVID CROMPTON,

     Third-Party Plaintiff,

v.

MUELLER INDUSTRIES, INC.,

     Third-Party Defendant.

---

**DEFENDANT'S ANSWER, COUNTERCLAIM & THIRD-PARTY COMPLAINT**

---

     For his answer to the Complaint of Plaintiff Mueller Brass Co. ("Plaintiff") Defendant David Crompton ("Defendant") hereby states as follows:

**<u>PARTIES</u>**

     1.     Defendant admits the allegations in paragraph 1 of the Complaint on information and belief.

2.      Defendant admits he resides at the address set forth in paragraph 2 of the Complaint. The remaining allegations in paragraph 2 of the Complaint set forth legal conclusions to which no response is necessary.

## JURISDICTION AND VENUE

3.      Paragraph 3 of the Complaint sets forth legal conclusions regarding personal jurisdiction to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations in paragraph 3 of the Complaint.

4.      Paragraph 4 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations in paragraph 4 of the Complaint.

## FACTS

5.      Defendant admits that he previously served as President and CEO of Quick Fitting, Inc. ("QFI").  Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 5 of the Complaint, and therefore denies same.

6.      Defendant admits the allegations in paragraph 6 of the Complaint.

7.      Defendant admits only Plaintiff is a participant in the brass and copper-based alloy manufacturing sector. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 7 of the Complaint, and therefore denies same.

8.      Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 8 of the Complaint, and therefore denies same.

9.     Defendant admits the allegations set forth in paragraph 9 of the Complaint only insofar as they pertain to QFI.  Defendant denies the remaining allegations in paragraph 9.

10.     Defendant admits the allegations set forth in paragraph 10 of the Complaint only insofar as they pertain solely to Defendant's activities in his capacity as QFI's President and CEO. Defendant denies the remaining allegations in paragraph 10.

11.     Defendant admits that he informed Mueller executives, including Mueller's Chairman and CEO, that Mueller's failure to make timely payments on QFI's open invoices was causing QFI to experience financial difficulties, and denies the remaining allegations in paragraph 11.

12.     Defendant admits that Mueller Brass and QFI discussed a potential transaction that QFI was led to believe would be intended to preserve the parties' existing commercial relationship, and that said transaction included Mueller's acquisition of certain QFI's third-party debt and purported provision of a working capital facility, but denies the characterization that Mueller's true purpose was "to support Quick Fittings in addressing its financial troubles" and that the working capital facility was "for Quick Fitting's benefit."

13.     Defendant admits the allegations in paragraph 13 of the Complaint.

14.     Defendant admits that he executed the notes and agreement comprising the Antipodes Loan on behalf of QFI and in his capacity as QFI's President and CEO.  By way of further response, Defendant states that the documents attached as Exhibit A referenced in paragraph 14 of the Complaint are written documents that speak for themselves.

15.     Defendant admits that he executed the notes referenced in paragraph 15 of the Complaint on behalf of QFI and in his capacity as QFI's President and CEO.

16.     Defendant denies the allegations in paragraph 16 of the Complaint.

17.     Defendant admits the allegations in paragraph 17 of the Complaint.

18.     Defendant admits that he executed the Credit Agreement and the Line of Credit Note for the JPM Loan on behalf of QFI and solely in his capacity as QFI's President and CEO.

19.     Defendant admits the allegations in paragraph 19 of the Complaint.

20.     Defendant admits the allegations in paragraph 20 of the Complaint.

21.     Defendant admits the allegations in paragraph 21 of the Complaint.

22.     Defendant admits the allegations in paragraph 22 of the Complaint. By way of further response, Defendant states that the document attached as Exhibit B referenced in paragraph 22 of the Complaint is a written document that speaks for itself.

23.     Defendant admits that he executed an amendment of the Antipodes Loans on behalf of QFI and in his capacity as QFI's President and CEO. By way of further response, Defendant states that the document attached as Exhibit C referenced in paragraph 23 of the Complaint is a written document that speaks for itself.

24.     Defendant admits that Mueller purchased the JPM Loan on April 15, 2020, with QFI's consent, but denies that his expression of assent was given in any capacity outside of that as QFI's President and CEO.

25.     Defendant denies the allegations in paragraph 25 of the Complaint.

26.     Defendant admits only that Mueller purchased the JPM Loan from JP Morgan. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the remaining allegations set forth in paragraph 26 of the Complaint, and therefore denies same.

27.     Paragraph 27 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the

remaining allegations set forth in paragraph 27 of the Complaint, and therefore denies same. By way of further response, Defendant states that to the extent the allegations in paragraph 27 of the Complaint reference written documents, such written documents speak for themselves.

28. Defendant admits only that he executed the JPM Assignment and Acceptance on behalf of QFI and in his capacity as QFI's President and CEO.

29. Defendant admits only that Mueller purchased the Antipodes Loans from Antipodes. By way of further response, Defendant states that the document attached as Exhibit D referenced in paragraph 29 of the Complaint is a written document that speaks for itself.

30. Paragraph 30 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth therein, and therefore denies same. By way of further response, Defendant states that to the extent the allegations in paragraph 30 of the Complaint reference written documents, such written documents speak for themselves.

31. Defendant admits that he executed the Antipodes Assignment and Acceptance on behalf of QFI and in his capacity as QFI's President and CEO.

32. Defendant admits that Mueller Brass and QFI executed a Credit Agreement that Mueller had represented as providing a $4 million Working Capital Fund to fund QFI's operations, but denies the characterization, insinuation, and allegation in paragraph 32 in the Complaint that it limited QFI's draw rights to the "specific conditions" as unilaterally defined and unjustifiably imposed by Mueller.

33. Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 33 of the Complaint, and therefore denies same.

34.     Defendant admits only that he executed the Credit Agreement for the Working Capital Fund on behalf of QFI and in his capacity as QFI's President and CEO.

35.     Defendant admits only that he visited Mueller's corporate headquarters in February 2020 solely in his capacity as QFI's President and CEO.

36.     Defendant admits that in February 2020, in his capacity as QFI's President and CEO, Defendant engaged in discussions with Mueller executives, including Mueller's Chairman and CEO, for the purpose of exploring a potential transaction on behalf of QFI and in which Mueller revealed its interest in obtaining an equity interest in QFI.  Defendant denies the remaining allegations set forth in paragraph 36 of the Complaint.

37.     Defendant admits only that he engaged in discussions with Mueller executives regarding a proposed credit facility, and denies the remaining allegations in paragraph 37 of the Complaint.

38.     Defendant admits only that Mueller was aware of the Personal Guaranty, and denies the remaining allegations in paragraph 38 of the Complaint.

39.     Paragraph 39 of the Complaint sets forth legal conclusions regarding personal jurisdiction to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations in paragraph 39 of the Complaint.

40.     Defendant denies the allegations in paragraph 40 of the Complaint.

41.     The allegations of paragraph 41 sets forth legal conclusions to which no response is required, and Defendant otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 41 of the Complaint, and therefore denies same.

42.     Defendant admits only to receiving the documents referenced in paragraph 42 of the Complaint on behalf of QFI and solely in his capacity as QFI's President and CEO.

43.     The allegations of paragraph 43 contains legal conclusions to which no response is required, and Defendant otherwise lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 43 of the Complaint, and therefore denies same.

44.     Paragraph 44 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies them or lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 44 of the Complaint, and therefore denies same.

45.     Paragraph 45 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 45 of the Complaint.

46.     Paragraph 46 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 46 of the Complaint.

47.     Paragraph 47 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 47 of the Complaint.

48.     Paragraph 48 of the Complaint sets forth legal conclusions to which no response is required and merely reproduces a purported excerpt from the Guaranty, a written document that speaks for itself. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 48 of the Complaint.

49.      Paragraph 49 of the Complaint sets forth legal conclusions to which no response is required and merely reproduces a purported excerpt from the Guaranty, a written document that speaks for itself.   To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 49 of the Complaint.

50.      Paragraph 50 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 50 of the Complaint.

51.      Paragraph 51 of the Complaint sets forth legal conclusions to which no response is required and merely reproduces a purported excerpt from the Guaranty, a written document that speaks for itself.   To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the allegations set forth in paragraph 51 of the Complaint.

52.      Defendant admits the allegations in paragraph 52 of the Complaint.

53.      Defendant admits only to receiving the demand referenced in paragraph 53 of the Complaint. Paragraph 53 also states a legal conclusion to which no response is required.   To the extent a response is deemed required, or the paragraph sets forth allegations of fact, Defendant denies the remaining allegations in paragraph 53 of the Complaint.

## COUNT I: BREACH OF CONTRACT / BREACH OF GUARANTY

54.      Defendant incorporates the responses to paragraphs 1 through 53 as if set forth fully herein.

55.      Paragraph 55 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

56.      Paragraph 56 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

57.     Paragraph 57 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

58.     Paragraph 58 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

59.     Paragraph 59 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

60.     Paragraph 60 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

61.     Paragraph 61 of the Complaint sets forth legal conclusions to which no response is required and references a written document that speaks for itself. To the extent a response is deemed required, Defendant denies the allegations.

62.     Paragraph 62 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

63.     Paragraph 63 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

64.     Paragraph 64 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant lacks knowledge or information sufficient to form a belief as to the truth of the allegations set forth in paragraph 64, and denies same.

65.     Paragraph 65 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

66.     Paragraph 66 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

67.     Paragraph 67 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

68.     Paragraph 68 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

69.     Defendant denies the allegations in paragraph 69 of the Complaint.

70.     Paragraph 70 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

71.     Paragraph 71 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

72.     Paragraph 72 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

73.     Paragraph 73 of the Complaint sets forth legal conclusions to which no response is required. To the extent a response is deemed required, Defendant denies the allegations.

74.     Defendant denies the allegations in paragraph 74 of the Complaint.

## PRAYER FOR RELIEF

Defendant denies that Plaintiff is entitled to any of the relief which it claims in the Complaint.

## AFFIRMATIVE DEFENSES

A.     The Complaint may be barred, in whole or in part, by Fed. R. Civ. P. 12(b)(6) for failure to state a claim upon which relief can be granted.

B.     The Complaint may be barred, in whole or in part, by the applicable Statue of Limitations.

C.      The Complaint may be barred, in whole or in part, by the applicable Statute of Frauds.

D.      The Complaint may be barred, in whole or in part, by illegality under applicable law.

E.      The Complaint may be barred, in whole or in part, by the doctrine of unclean hands.

F.      The Complaint may be barred, in whole or in part, by release.

G.      The Complaint may be barred, in whole or in part, by waiver.

H.      The Complaint may be barred, in whole or in part, by payment or settlement.

I.      The Complaint may be barred, in whole or in part, by accord and satisfaction.

J.      The Complaint may be barred, in whole or in part, by the doctrine of estoppel.

K.      The Complaint may be barred, in whole or in part, as a result of Plaintiff's failure to mitigate damages.

L.      The Complaint may be barred, in whole or in part, by failure of a condition(s) precedent or condition(s) subsequent.

M.      The Complaint may be barred, in whole or in part, by a lack or failure of consideration.

N.      The Complaint may be barred, in whole or in part, by Defendant's equitable right to set-off and offset.

O.      The Complaint may be barred, in whole or in part, as a result of the acts and/or omissions of Plaintiff and/or those for whom Plaintiff is responsible.

P.      The Complaint may be barred, in whole or in part, by the material increase of the Guaranty's scope of risk as a result of actions taken by Plaintiff.

Q.      The Complaint may be barred, in whole or in part, by Plaintiff's impairment of collateral.

R.      The Complaint may be barred, in whole or in part, by the terms and conditions of the Guaranty under applicable law and/or by Plaintiff's failure to comply with said terms and conditions and breach of the agreement as successor or otherwise.

S.      The Complaint may be barred, in whole or in part, by Plaintiff's breach of a related agreement.

T.      The Complaint may be barred, in whole or in part, by Plaintiff's material alteration of the scope of risk.

U.      The Complaint may be barred, in whole or in part, by Plaintiff's failure to provide notice.

V.      The Complaint may be barred, in whole or in part, by novation.

W.      The Complaint may be barred, in whole or in part, by Plaintiff's breach of the implied covenant of good faith and fair dealing.

X.      The Complaint may be barred, in whole or in part, by the Complaint that the Complaint was filed in bad faith for the purpose of coercing Defendant to pay Plaintiff monies it knows are not due and owing.

Y.      The Complaint may be barred, in whole or in part, by Plaintiff's deceptive and fraudulent conduct.

Z.      The Complaint may be barred, in whole or in part, by economic duress.

AA.     The Complaint may be barred, in whole or in part, as a result of the acts and/or omissions of non-parties for whom Defendant is not responsible or liable.

BB.    The Complaint may be barred to the same extent there are defenses or claims available to the Debtor named in the Personal Guaranty, or otherwise available against the original Lender.

CC.    The Complaint may be barred, in whole or in part, as a result of defects or illegality in the purported assignment of the underlying loan under applicable law.

DD.    Defendant reserves the right to assert any additional Affirmative Defenses as discovery in the case proceeds forward.

## COUNTERCLAIM & THIRD-PARTY COMPLAINT

Having fully answered the Complaint, Defendant/Counter-Plaintiff/Third-Party Plaintiff David Crompton, hereby asserts the following counterclaim against Plaintiff/Counter-Defendant Mueller Brass Co. and, pursuant to Fed. R. Civ. P. 14,  brings the following claim against Third-Party Defendant Mueller Industries, Inc.:

### PARTIES

1.    Counter-Plaintiff/Third-Party Plaintiff David Crompton ("Crompton") is a resident of the state of Connecticut and the former President and CEO of Quick Fitting, Inc. ("QFI"), a Rhode Island corporation currently in receivership proceedings captioned *Michael Absher, et al. v. Quick Fitting, Inc.*, No. KC-2020-0501 (R.I. Sup. Ct.) (the "Receivership Action").

2.    Counter-Defendant Mueller Brass Co. ("MBC") is a corporation organized under the laws of the State of Michigan with its principal place of business and headquarters located in Collierville, Tennessee.

3.      Third-Party Defendant Mueller Industries, Inc. ("MLI") is a publicly traded corporation organized under the laws of the State of Delaware with its principal place of business and headquarters located in Collierville, Tennessee.

## JURISDICTION AND VENUE

4.      This Court has jurisdiction over this matter under 28 U.S.C. § 1332, as the parties are citizens of different states and the amount in controversy exceeds $75,000.

5.      This Court also has jurisdiction over this matter under 28 U.S.C. § 1367, as the third-party claim is so related to the claim and counterclaim in the original action that it forms part of the same case or controversy.

6.      This Court has personal jurisdiction over the Third-Party Defendant MLI because MLI's principal place of business is Collierville, Tennessee, and MLI acted with MBC and other MLI subsidiaries to perform actions in this judicial district that caused injury to Crompton.

7.      Venue is proper in this judicial district pursuant to 28 U.S.C. § 1391, as a substantial part of the events or omissions giving rise to the claims herein occurred in this judicial district, and the Third-Party Defendant is subject to personal jurisdiction in this judicial district.

## FACTS

8.      QFI was formed in 2007 to develop and sell products using a patented design for connecting plumbing pipe and conduit. Over the years, QFI secured additional patents and expanded applications for its intellectual property in the electrical, HVAC and fire suppression product areas. QFI contracts with product manufacturers in the United States and China and sells its products primarily through distributors.

14

9.      MLI, by and through MBC and other various subsidiaries (collectively referred to herein as "Mueller"), is a publicly traded company and a distributor of QFI products.  Mueller is also QFI's largest customer.

10.      In July 2011 Mueller was given non-exclusive rights to sell certain QFI plumbing products pursuant to a Supply and Distribution Agreement with QFI (the "Plumbing Supply Agreement").

11.      In January 2018 Mueller entered into an Exclusive Supply and Distribution Agreement to distribute and sell a new line of proprietary electrical connection products developed by QFI that incorporate QFI's patented intellectual property (the "Electrical Supply Agreement").

12.      The distribution agreements described in the preceding paragraphs indicate that Mueller recognized the QFI's patented technology and intellectual property had substantial value.

**QFI's Secured Debt and Crompton's Personal Guaranty of the Antipodes Loan**

13.      In April 2019, QFI issued two promissory notes to Antipodes Acquisition Limited ("Antipodes"), a New Zealand company owned by one of Quick Fitting's preferred shareholders. The Antipodes notes (collectively, the "Antipodes Loan") and include choice of law provisions providing that the notes shall be construed in accordance with and governed by the laws of New Zealand.  The Antipodes Loan was secured by QFI's assets and first in priority.

14.      In  September 2019 QFI obtained a $4 million line of credit from JP Morgan (the "JPM Loan") which subordinated the Antipodes Loan and gave JP Morgan first secured position. As part of the transaction, Crompton provided a personal guaranty (the "Personal Guaranty") to Antipodes concerning the Antipodes Loan, which, like the Antipodes notes, included a New Zealand choice of law provision.

**Mueller Employs Its Playbook of Unfair Business Practices to Prey on QFI**

15.     Mueller has a long history of using unfair business and trade practices to strategically generate financial stress on suppliers and create economic duress that Mueller exploits to its own benefit.

16.     During 2019 and 2020 Mueller exploited QFI's vulnerabilities to earn Crompton's trust and confidence, while at the same time actively engineering conditions to generate terminal levels of stress on QFI with the intention of incapacitating QFI as a going concern.

17.     Mueller's overriding objective throughout 2019 and 2020 was to gain functional control and dominion over QFI's financial decision-making, to acquire QFI's assets at an artificially distressed value, and, worse yet, later to harm Crompton personally by seeking improperly to cash-in further on the Personal Guaranty he executed.

18.     All of Mueller's interactions with Crompton—whether genuine or deceitful in nature—were intended to manipulate and eventually neutralize Crompton as an obstacle to Mueller's achieving the objective described in the foregoing paragraph.

**Mueller Leverages Subsidiary Invoices to Generate Acute Financial Stress on QFI**

19.     It is the practice of Mueller to delay or withhold payments on invoices from Mueller's suppliers.

20.     In this case, MLI's subsidiary, B&K, LLC d/b/a BK Products ("B&K"), was a significant customer of QFI.

21.     B&K was chronically delinquent in paying invoices from QFI.

22.     On or around October 8, 2019, MLI CEO and Chairman Greg Christopher ("Christopher") sent Crompton a request for all B&K's unpaid invoices and stated, "I will get it reconciled with in [sic] 30 minutes tomorrow and get this problem resolved[.]"

23.     On October 9, 2019, Crompton sent Christopher a link to a downloadable file containing copies of all of B&K's open invoices.

24.     Two days later Christopher responded with a memo to Crompton, in which Christopher acknowledged Mueller's awareness of the delinquent invoice payments and Mueller's responsibility to resolve the problems and pay the amounts owed to QFI:

> Nick [Moss, Mueller President] has a very good understanding of how bad this is and will be attacking it immediately.  The first step is for Nick to confirm an order management flow and communicate this to QF and Southwire.  This should be implemented tonight so these errors are brought to a halt at least going forward.   We have all hands on deck trying to get all of this resolved.

25.     Despite Christopher's assurances to Crompton that Mueller had "all hands on deck" and "will be attacking [the unpaid invoices] immediately," Mueller continued to find excuses and refused to resolve B&K's unpaid invoices as promised.

26.     On December 17, 2019, Crompton sent an email to MLI President Nick Moss ("Moss") reiterating the strain placed on QFI by Mueller's failure to rectify the long overdue invoices to B&K:

> As we have discussed on numerous occasions, Mueller/B&K's failure to pay invoices when due has placed heavy burdens on Quick Fitting. As I mentioned in last Monday's email, QFI's shareholders and financial partners have lost their patience with the protracted payment process and long-overdue invoices over the past several months.

27.     On January 6, 2020, Christopher sent an email to Crompton, in which Christopher referenced Crompton's December 17 email and suggested he didn't understand it but wanted "to have a call to get clarity."

28.     Given the pressure to sustain QFI's operations and preserve its value, Crompton in good faith agreed to a phone call and discussion, during which Christopher conveyed MLI's interest in a strategic acquisition of QFI.

**Christopher Continues a Pretense of Good Faith to Induce Crompton's Confidence and Position Mueller to Exercise Control Over QFI**

29.     The morning of January 9, 2020, Christopher sent an email to Crompton with the following request: "Could you send to me in confidentiality the proposed offer you mentioned you would share with me? I am trying to wrap my head around all options."  At the time, there was no non-disclosure agreement (NDA) between Mueller and QFI.

30.     Crompton insisted on an NDA prior to providing the requested information, and later in that day, January 9, MLI signed an NDA which bound Christopher and Mueller to ensure that QFI's proprietary information would be kept confidential. The NDA gave rise to a confidential relationship between QFI and Mueller, and thereafter Crompton shared with Christopher detailed and confidential financial information regarding QFI's tenuous financial position.

31.     On January 20, 2020, Crompton provided MLI with copies of the Antipodes Notes and the JPM Line of Credit Note.

32.     More than a week after having been provided QFI's confidential information, in a letter to Crompton dated January 23, 2020, Christopher outlined an offer by Mueller to purchase 55% of QFI. Christopher's letter emphasized Mueller's desire for more confidential information from QFI and acknowledged the confidence Crompton was placing in Mueller by virtue of the discussions:

> However, don't underestimate the potential of this offer.  **If we can move to a point where you are willing to share more details** of the historical financial performance of the business, ownership structure and other relevant information, perhaps we can construct other components of our offer that might bridge some of the gap and be exciting and rewarding to you.  I appreciate **your candor and your confidence in Mueller**.  Nick and I think together we can do amazing things, have fun and make a lot of money.

(emphasis added).

33.     In February 2020 Christopher discussed with Crompton the proposed purchase by Mueller of 51% of QFI's equity for $18 million, a figure predicated on an enterprise value of approximately $36 million.

34.     On another occasion in late February 2020 Christopher provided Crompton a handwritten proposal which indicated a $50 million enterprise value.

35.     Despite Crompton's repeated requests to Christopher, Mueller refused to produce a written term sheet, purchase agreement or binding letter of intent.

36.     With the acquisition "negotiations" strategically delayed by Christopher, different divisions of Mueller collected additional confidential and critical financial, customer, and supplier information.

37.     On March 4, 2020, Mueller provided Crompton with a "Non-Binding Indication of Interest" that described an offer of $18 million for 51% of QFI's equity, and included terms regarding Crompton's ongoing employment with QFI and the settlement of all QFI's debt, expressly mentioning the Antipodes Loan for which Crompton had provided the Personal Guaranty.

38.     On March 12, 2020, Mueller re-characterized its offer as a non-binding "proposal," and reduced the offer to $18 million for 65% of QFI's equity, a figure based on an enterprise value of approximately $27.7 million.

**Mueller Makes False Promise of a "Life Line" of $4 Million in Working Capital Support**

39.     Mueller continued to insist that it remained interested in completing an equity purchase in QFI but refused to provide a term sheet or binding letter of intent that would enable Crompton and QFI to make an informed decision on Mueller's purported offer.

40.     Aware that prolonged equity purchase "negotiations" would continue to weaken QFI, Mueller claimed it was offering to provide a $4 million in working capital to support and stabilize QFI until a new source of capital and long-term financial solution was in place.

41.     Crompton communicated QFI's chief concern regarding the proposal, namely, the assurance that QFI's right to draw on the $4 million working capital would be appropriately scoped to meet the actual operating needs of the company and avoid an event of default.

42.     In a March 28, 2020 email to Crompton, Christopher describes his recent work as "fixing [QFI]" and the $4 million as a "life line" that was intended to keep QFI looking to Mueller for its financial support: "I felt if you went in any other direction you would basically be starting over and have to give up most of everything so I offered a life line with the $4m until we could figure out how to arrange something to go forward."  In the same email Christopher  insisted that he is known as a person who "honors [his] word" and "do[es] what we discussed verbally[.]"

43.     Christopher's March 28 email demonstrated that Mueller was aware of its confidential relationship with QFI and its ability to exercise dominion and control over QFI.

44.     On March 29, 2020, Crompton requested that Christopher provide clarity on how the $4 million working capital proceeds would be released so that QFI could address JP Morgan's corresponding concerns about its security interests on the JPM Loan and the avoidance of an event of default.

45.     In his reply to Crompton, Christopher gave Crompton the false assurance that, "I am protecting you with the proposal of equity, buy back and salary. Once Mueller feels comfortable the IP is protected you can go any direction you choose."

46.     On March 31, 2020, MLI and QFI executed a credit agreement that was to provide $4 million working capital to QFI (the "Mueller WC Loan").

47.     As part of the Mueller WC Loan, Mueller received a security interest in all of QFI's assets and as well as an option to purchase up to a 20% interest in QFI for $4 million upon the occurrence of default by QFI.

48.     Close to the time that the Mueller WC Loan was executed, Mueller advanced approximately $1.95 million of the Mueller WC Loan funds directly to QFI's suppliers in China, which funds were used to ensure product flow to Mueller.

49.     On April 2, 2020, Christopher recommended to Crompton that QFI start implementing layoffs and reducing its overhead.

50.     On April 3, 2020, only three days after execution of the Mueller WC Loan and after receiving indications that Mueller was refusing to release working capital, Crompton sent an email to Mueller's CFO requesting clarity and guidance:

> Jeff, I would greatly appreciate your response this morning. Your response will guide me through the decision process of operating the business. To be clear, if the structure is actually the 100k bucket limitation per week, the process would starve the business.

51.     In directing Mueller's response to Crompton's questions, Christopher sent an email to Martin and Moss stating "[t]his is what I agreed to with QF regarding our 4m loan" and "imposing additional limitations on Mueller's release of working capital payments, including "[o]nly those related to vendors that will get [Mueller's] product moving" and, subject to Mueller's approval, "other payments up to 100k. (no payroll and only critical items to help our business)."

52.     Mueller used the Mueller WC Loan to extend its dominion and control over QFI's operations, including QFI's personnel decisions, its customer and supplier relationships, and to continue exerting coercive influence on QFI's executive decision-making.

53.     The working capital that Mueller promised was never provided in its entirety. Rather, Mueller only made payments totaling $2.3 million, all of which went solely to QFI suppliers to ensure product flow to Mueller.

54.     MLI prevented QFI from drawing down against the balance of the Mueller WC Loan and prohibited QFI from securing alternative financing or investment, the effect of which to starve QFI of cash flow needed to survive.

**Mueller Withholds Working Capital While Pursuing the JPM Loan and Antipodes Loan**

55.     While denying funding requests by QFI under the Mueller WC Loan, Mueller continued to take affirmative steps to purchase the JPM Loan and Antipodes Loan so that it could obtain a first position security interest on QFI's assets, including QFI's valuable patent portfolio.

56.     On or around March 20, 2020, Christopher indicated to Crompton that MLI was interested in purchasing the JPM Loan and the Antipodes Loan.

57.     On March 23, 2020, Crompton sent an email to Mueller CFO Jeff Martin ("Martin") requesting an update on imminent vendor payments and clarification regarding the release of funds under soon-to-be-finalized Mueller WC Loan. In reply, Martin stated, "[t]omorrow, once [we] make the payments below and we get all the docs / signatures on the $4 million loan, let's talk" and reiterated a prior request to provide contact info for JP Morgan and Antipodes so that Mueller could directly contact QFI's secured lenders regarding the purchase of the JPM and Antipodes Loans, respectively.

58.     On April 15, 2020 MLI purchased the JPM Loan.

59.     On May 1, 2020, Crompton executed, solely on behalf of QFI, QFI's consent to the assignment of the Antipodes Loan to Mueller.

60.     With this assignment, Mueller also became positioned to further abuse its confidential relationship with Crompton and improperly seek to leverage and monetize the Personal Guaranty.

61.     Crompton executed QFI's consent to the assignment of the Antipodes Loan  based on the representation and belief Mueller was proceeding in good faith.

**Mueller Abandons the Pretense of Good Faith and Forces QFI into Default**

62.     Four days later, around May 5, 2020, Mueller made explicit what it had intended all along and informed QFI that it was seeking to acquire all of QFI's assets before May 23, 2020.

63.     Mueller continued to modify its verbal acquisition offer, with each iteration becoming more predatory.  In addition, Mueller informed Crompton that if QFI declined the offer, Mueller would simply find QFI in default on the secured loans and proceed to foreclose on QFI's assets.

64.     The course of action Mueller threatened to take would leave the majority of QFI's 46 employees without employment and stakeholders of the company without equitable consideration.

65.     By securing its first position and refusing to release the remaining $2 million, Mueller was able to wield the threat of foreclosing on QFI's assets instead of proceeding with the equity purchase negotiation that it had previously entered with QFI.

66.     On May 21, 2020, mere weeks after indicating its plans to make an offer based upon a valuation of approximately $27.7 million, Mueller made a written offer to purchase all of QFI's assets in exchange for only the forgiveness of its secured debt—approximately $9 million— and a 25% ownership interest in a new company formed by Mueller to control and own QFI's intellectual property and inventory.

67.     In the intervening time period between the May 21 offer and the March letter of intent, the only changes in circumstances were Mueller's purchase of QFI's secured debt to JP Morgan and Antipodes, and the continued impact of the COVID-19 pandemic.

68.     Days before sending QFI its reduced offer on May 21, Mueller had already started asserting overt control over QFI. On May 15, 2020 Mueller sent an email to various QFI employees stating, "Welcome to the Mueller family." Also, in mid-May, QFI was informed by its suppliers that they were being contacted directly by Mueller about the schedule of deliveries to QFI and at least one factory received a direct order from Mueller for QFI product.

69.     On May 26, 2020, five days later after making its reduced offer to acquire QFI's assets, Mueller informed QFI that it was terminating the Plumbing Supply Agreement that had been in place since 2011.

70.     On June 1, 2020, Mueller sent QFI notices declaring QFI in default of the Working Capital Credit Facility, the JPM Note and the Antipodes Note (the "Default Notices"). The notices cited the following events of technical default:

- QFI's failure to pay prior period interest and late fees on the three loans totaling approximately $35,000;
- QFI's failure to provide a Compliance Certificate for the quarter ended March 31, 2020; and
- QFI's failure to provide audited financial statements for the fiscal year ending December 31, 2019.

71.     Each Default Notice also included as an event of default QFI's alleged defaults under the other two notes. In the Default Notices, Mueller gave notice of acceleration of the loans and demanded payment of all outstanding principal and interest as follows:

- Credit Line:        $2,284,353.57
- JPM Note:         $4,049,893.06
- Antipodes Note:  $2,527,114.73 (New Zealand dollars) and
                         ¥126,061,074.82 (Japan Yen)

**QFI Enters Receivership and the Receiver Recognizes Mueller's Wrongful Conduct**

72.     On June 8, 2020, QFI's preferred shareholders moved for the appointment of a receiver before Rhode Island Superior Court in Kent County, RI (the "Receivership"). On June 9, 2020, the Rhode Island Court appointed Richard J. Land first as a temporary receiver and later converted the appointment to permanent receiver (the "Receiver").

73.     Early in the Receivership, the Receiver became aware of Mueller's responsibility in creating the conditions that forced QFI to default and resulted in the Receivership, including Mueller's actions to throttle QFI's cash flow by failing to pay invoices, Mueller's refusal to release funds under the Mueller WC Loan, Mueller's improper contact and communications with QFI's customers, and its predatory pursuit of QFI's assets.

74.     On August 20, 2020, Mueller filed an objection to the Receiver's Petition for Post-Petition Financing.

75.     On August 24, 2020, the Receiver filed the Receiver's Response to Mueller's Objection to Petition to Obtain Post-Petition Financing ("Receiver's August Response"), wherein on pages 2-3 the Receiver informed the Rhode Island court as follows:

> Presently, Mueller is improperly withholding approximately $360,000 of funds due to QFI. Before the Receivership (and continuing to this date), Mueller has also refused to fund the approximately $1.8MM balance of QFI's line of credit.  Although the Receiver has yet not evaluated Mueller's justification for refusing to fund the balance of the line of credit, QFI's management has indicated that such action was unjustified. The Receiver has thus far sought to avoid litigating the line of credit and deposit issues, **but in the aggregate, Mueller has prevented QFI from obtaining over $2.0MM in operational funding. Mueller's attempt to gloss over its own conduct and contribution to QFI's need for financing should not be overlooked**.

(emphasis added).

76.     In Footnotes 7 and 8 of the Receiver's August Response, the Receiver described Mueller's actions in terms of "unclean hands" and cited several specific factors giving rise to

concerns regarding Mueller's actions, including Mueller's "position in QFI's customer mix and QFI's operations.":

> 7.  While there is a dispute regarding Mueller's right to hold onto the Southwire deposit funds, **Mueller's refusal to turn over those funds to the Receiver should preclude Mueller's ability to object under the doctrine of unclean hands**. See e.g. Martellini v. Little Angels Day Care, Inc., 847 A. 2d 838, 842 (R.I. 2004) ("plaintiff's improper conduct is the source, or part of the source, of his equitable claim, that he is to be barred because of this [bad] conduct.").

> 8. A preliminary review of the Mueller/QFI relationship does concern the Receiver, **particularly because of the timing of Mueller's financing, acquisition of debt, and its position in QFI's customer mix and QFI's operations**.

(emphasis added).

77.    The Receiver's August Response presented the stark reality that Mueller's objections indicated that Mueller preferred to see QFI operationally incapacitated even though QFI's value as a going concern would likely exceed its liquidation value (and thereby improve Mueller's prospects as a secured creditor) and that QFI's continued operations would redound to the benefit of Mueller's customer Southwire.  On page 2 of the Receiver's August Response, the Receiver explained as follows:

> Moreover, the Receiver has explained to Mueller during several telephone calls that he would need administrative financing to continue operations, that the operations are primarily for the benefit of Mueller and Southwire (Mueller's customer) and that without the funding, the Company would not be able to fulfill the orders placed by Southwire (the very issue about which Mueller has expressed significant concern).

On pages 7-8 of the Receiver's August Response, the Receiver argued as follows:

> [T]his Court can and should approve the post-petition financing over the objections because Mueller and the [co-objector] Trust stand to directly benefit from the post-petition financing. The sale of QFI's assets on a going-concern basis, which ought to exceed liquidation value, will benefit Mueller's collateral if its secured claim is approved and, with respect to the Trust, would increase the value of the estate available to potentially pay unsecured claims. Finally, the Court should not overlook that QFI's continued operation largely benefits Mueller by QFI producing products to be sold to Mueller's customer, Southwire.

78.     The observations, facts, and arguments made in the Receiver's August Response demonstrate the continuation of Mueller's singular goal of acquiring QFI's assets at a distressed value and its sheer indifference to QFI's operations, employees, and smaller stakeholders.

79.     During the Receivership Mueller actively undermined QFI's ability to attract prospective acquirers by poaching QFI employees, disparaging Crompton, misrepresenting its margins to customers like Southwire, and continuing to exert control over QFI's operations to further Mueller's desired end-state—the abolition of QFI.

80.     During the Receivership, Crompton continued to provide, out of his personal resources, financial support to cover QFI expenses and obligations in order to preserve QFI's attractiveness to potential acquirers during the Receivership.

81.     While Mueller actively worked to subvert Crompton's and the Receiver's efforts to stabilize QFI as a going concern and maximize its value in a sale, Mueller also commenced this litigation to pursue Crompton personally on the basis of the Personal Guaranty of the Antipodes Loan.

82.     In other words, after having successfully carried out its plan to distress and exploit QFI, Mueller next sought "to have its cake and eat it too" by seeking payment from Crompton personally.

83.     Even in the context of negotiating a favorable settlement of its claims in the Receivership, Mueller refused to apply any semblance of decency or reasonableness in its pursuit of Crompton.

84.      Mueller and the Receiver recently agreed to a settlement for which the Receiver filed a Petition to Compromise Claims on May 5, 2021 ("Petition to Compromise").

85.     The Petition to Comprise described the four loans comprising Mueller's secured claim, two of which are the notes for which Crompton provided the Personal Guaranty to Antipodes.

86.     The Petition to Comprise revealed that Mueller's proposed *allocation* of settlement proceeds provides for *overpayment* for the non-guaranteed loans and *underpayment* of the Antipodes notes for which Crompton gave the Personal Guaranty.[1]   Mueller's allocation is as follows:

### Overpayment of Non-Guaranteed Loans

| JP Morgan Loan | | Mueller Working Capital Loan | |
|---|---|---|---|
| Amount Claimed: | $4,153,995.76 | Amount Claimed: | $2,436,955.52 |
| Amount Allocated: | $4,479,534.00 | Amount Allocated: | $2,762,494.00 |
| *Overpayment:* | *$325,538.24* | *Overpayment:* | *$325,538.48* |

### Underpayment of Guaranteed Loans

| Antipodes $NZ Loan | | Antipodes Yen Loan | |
|---|---|---|---|
| Amount Claimed: | $1,991,362.37 | Amount Claimed: | $1,289,368.37 |
| Amount Allocated: | $1,122,736.00 | Amount Allocated: | $1,122,736.00 |
| *Underpayment:* | *$868,626.37* | *Underpayment:* | *$166,632.37* |

87.     Mueller's purported allocation of settlement proceeds to preserve a deficiency on the Antipodes Loan and the pretext to pursue Crompton personally further demonstrates Mueller's complete abandonment of reasonableness or good faith.

88.     The proposed Order approving the settlement of Mueller's claims includes an explicit caveat rejecting Mueller's allocation:

> **Nothing herein**, in the Settlement Agreement or in any final judgment hereon, **reflects the Receiver's or the Court's position as to, or approval of, Mueller's allocation of the settlement payment** made by the Receiver to Mueller under the Settlement Agreement,

---

[1] Plainly, Mueller's self-serving position on allocation is legally irrelevant. To the contrary, resolution of the underlying debt would have the effect of relieving Crompton of liability under the Personal Guaranty.

and this Order and the approval of the Court as set forth herein shall constitute an approval and ratification only of the aggregate settlement amount in connection with all of Mueller's claims against the receivership estate and the claims of the Receiver against Mueller.

(emphasis added).

89.     Using a playbook of unfair business practices, including its deceptive exploitation of Crompton's confidence and trust, and its exercise of dominion and control over QFI, Mueller intentionally created the circumstances that drove QFI into receivership and thereafter continued to undermine Crompton's and the Receiver's efforts to attract favorable acquisition interest in the Receivership.

90.     The predatory nature of Mueller's actions was explicitly recognized by the Receiver throughout the Receivership and the inequitable nature of Mueller's pursuit of Crompton was implicitly acknowledged by the Rhode Island court in its Order approving the settlement of Mueller's claims.

<u>**COUNT I:  PROMISSORY FRAUD**</u>
**(Against MBC and MLI)**

91.     Crompton re-alleges and incorporates all previous paragraphs herein.

92.     Christopher made numerous representations to Crompton regarding Mueller's intentions, including assurances that Mueller had "all hands on deck" to immediately address delinquent invoices, that Mueller maintained a genuine interest in purchasing QFI's equity in a transaction that would settle the Antipodes Loan, that Mueller sought to provide QFI a financial "life line", that Mueller was providing financial support with the aim of "protecting [Crompton] with the proposal of equity, buy back and salary", and that Mueller would provide specificity "once… and we get all the docs / signatures".

93.     At the time Mueller gave the above assurances and promises, Mueller had no intent to perform said promises or to allow the conditions necessary for said promises and assurances to be realized.

94.     Crompton reasonably relied upon the above assurances and promises given by Mueller, which reliance Mueller intended to induce Crompton to assent to the transactions described above, including QFI's consent to the assignment of the Antipodes Loan on May 1, 2020.

95.     As a result of Mueller's misrepresentations, Crompton has suffered damages in an amount to be determined at trial.

### COUNT II:  FRAUDULENT MISREPRESENTATION
### (Against MBC and MLI)

96.     Crompton re-alleges and incorporates all previous paragraphs herein.

97.     Christopher made numerous representations to Crompton regarding Mueller's intentions, including assurances that Mueller had "all hands on deck" to immediately address delinquent invoices, that Mueller maintained a genuine interest in purchasing QFI's equity in a transaction that would settle the Antipodes Loan, that Mueller sought to provide QFI a financial "life line", that Mueller was providing financial support with the aim of "protecting [Crompton] with the proposal of equity, buy back and salary", and that Mueller would provide specificity "once… and we get all the docs / signatures".

98.     At the time Christopher made the above representations, Christopher knew the information was false or materially incomplete.

99.     Crompton reasonably relied upon the above assurances and promises given by Christopher, which reliance Mueller intended to induce Crompton to assent to the transactions

described above, including QFI's consent to the assignment of the Antipodes Loan on May 1, 2020.

100.    As a result of Mueller's fraudulent misrepresentations, Crompton has suffered damages in an amount to be determined at trial.

## COUNT III:  NEGLIGENT MISREPRESENTATION
### (Against MBC and MLI)

101.    Crompton re-alleges and incorporates all previous paragraphs herein.

102.    Christopher made numerous representations to Crompton regarding Mueller's intentions, including assurances that Mueller had "all hands on deck" to immediately address delinquent invoices, that Mueller maintained a genuine interest in purchasing QFI's equity in a transaction that would settle the Antipodes Loan, that Mueller sought to provide QFI a financial "life line", that Mueller was providing financial support with the aim of "protecting [Crompton] with the proposal of equity, buy back and salary", and that Mueller would provide specificity "once… and we get all the docs / signatures".

103.    At the time Christopher made the above representations, Christopher had reason to know the information was false or materially incomplete and failed exercise reasonable care in obtaining or communicating the information constituting the above assurances and promises.

104.    Crompton reasonably relied upon the above assurances and promises given by Christopher, which reliance Mueller intended to guide Crompton in making business decisions and induce Crompton to assent to the transactions described above, including QFI's consent to the assignment of the Antipodes Loan on May 1, 2020.

105.    As a result of Mueller's negligent misrepresentations, Crompton has suffered damages in an amount to be determined at trial.

### COUNT IV:  BREACH OF CONTRACT, INCLUDING THE IMPLIED DUTY OF GOOD FAITH AND FAIR DEALING
**(Against MBC)**

106.    Crompton re-alleges and incorporates all previous paragraphs herein.

107.    As the purported assignee of the Antipodes Loan and the Personal Guaranty, MBC was bound by the implied covenant of good faith and fair dealing in its performance with respect to not only the Personal Guaranty but also the Antipodes Loan and the May 1, 2020 Assignment and Acceptance for which Crompton had given QFI's consent to MBC's acquisition of the Antipodes Loan.

108.    The Personal Guaranty and the May 1, 2020 Assignment and Acceptance included the obligation that MBC would act in good faith and fair dealing with QFI and the Antipodes Loan could not be used by the lender to intentionally and/or capriciously wield default power and deliberately prolong deficiencies to vindictively pursue and harm Crompton personally, particularly where sufficient repayment funds are available directly from the borrower QFI (for whose ultimate benefit Crompton gave the Personal Guaranty).

109.    MBC's purported allocation of settlement proceeds in the Receivership is further evidence of unfair dealing and demonstrates unreasonable animosity and the absence of good faith on the part of MBC in its treatment of Crompton and performance of the underlying agreements.

110.    As a result of MBC's multiple breaches of the implied covenant of good faith and fair dealing, Crompton has suffered damages in an amount to be determined at trial.

### COUNT V:  BREACH OF FIDUCIARY DUTY, INCLUDING DUTY TO DISCLOSE
**(Against MBC and MLI)**

111.    Crompton re-alleges and incorporates all previous paragraphs herein.

112.     Mueller's extensive involvement in QFI's financing, its acquisition of QFI's debt including the Antipodes Loan for which Crompton gave a Personal Guaranty, its progressively

32

expanding involvement with QFI's customers, and its controlling influence on QFI's operations gave rise to a repose of trust and confidence in Crompton's relationship with Mueller.

113.    Mueller's cultivation of a confidential relationship with Crompton resulted in Mueller having a fiduciary duty to Crompton, including the duty to disclose material facts that Mueller knew would justifiably induce Crompton to act or refrain from acting in business transactions.

114.    Mueller breached its fiduciary duty to Crompton by, *inter alia*, concealing that its true business objective in offering financing was to intensify rather than relieve QFI's economic duress and to engineer the conditions to acquire all of QFI's IP assets at a distressed valuation rather than support QFI's ability to continue operating.

115.    Mueller breached its fiduciary duty to Crompton by concealing and misrepresenting its intentions and strategy while persuading Crompton to give QFI's consent to the assignment of QFI's Antipodes Loan to Mueller, consent given at significant personal risk to Crompton but given nonetheless based on Crompton's trust and confidence in Mueller.

116.    As a result of Mueller's breach of fiduciary duty, Crompton has suffered damages in an amount to be determined at trial.

## PRAYER FOR RELIEF

WHEREFORE,  Defendant/Counter-Plaintiff/Third-Party  Plaintiff,  David  Crompton, hereby demands a jury to hear and try all issues properly submitted to a trier of fact and that this Court enter judgment in favor of Defendant/Counter-Plaintiff/Third-Party Plaintiff on all Counts of  his  Counterclaim  and  Third-Party  Claim,  award  Defendant/Counter-Plaintiff/Third-Party Plaintiff all costs incurred in connection with this matter, including interest and attorney's fees, enhanced damages as allowed under Tennessee and other applicable law, reimbursement for all

out-of-pocket expenses and time incurred on behalf of QFI in the Receivership, and any other such relief that this Court deems just and appropriate.

Dated: May 26, 2021                          Respectfully submitted,

                                             /s/Sarah Elizabeth Stuart
                                             Michael J. Sullivan (MA No. 487210)
                                             *Admitted pro hac vice*
                                             Ashcroft Law Firm, LLC
                                             200 State Street, Floor 7
                                             Boston, MA 02109
                                             (617) 573-9400
                                             msullivan@ashcroftlawfirm.com

                                             Lawrence Laurenzi (BPR No. 009529)
                                             Sarah Stuart (BPR No. 035329)
                                             Burch, Porter & Johnson, PLLC
                                             130 North Court Avenue
                                             Memphis, Tennessee 38103
                                             (901) 524-5000
                                             llaurenzi@bpjlaw.com
                                             sstuart@bpjlaw.com

                                             *Attorneys for Defendant David Crompton*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be electronically served on Plaintiff Mueller Brass Co. via the Court's ECF system this 26th day of May 2021.  A copy of the Third Party Complaint will be served upon Mueller Industries, Inc. in accordance with the Federal Rules of Civil Procedure.

                                             /s/ Sarah Elizabeth Stuart
                                             Sarah Stuart