**IN THE UNITED STATES DISTRICT COURT**
**FOR THE WESTERN DISTRICT OF TENNESSEE**
**WESTERN DIVISION**

---

MUELLER BRASS CO.,

       Plaintiff/Counter-Defendant,

v.                                                          No. 2:20-cv-02496-SHL-cgc

DAVID CROMPTON,

       Defendant/Counter-Plaintiff.

---------------------------------------------

DAVID CROMPTON,

       Third-Party Plaintiff,

v.

MUELLER INDUSTRIES, INC.,

       Third-Party Defendant.

---

**DEFENDANT DAVID CROMPTON'S MEMORANDUM IN SUPPORT OF**
**MOTION FOR JUDGMENT ON THE PLEADINGS, OR, IN THE ALTERNATIVE,**
**TO DISMISS ON MOOTNESS GROUNDS**

---

## *Introduction*

Defendant David Crompton ("Crompton") moves to dismiss this lawsuit based on a recent settlement between Plaintiff Mueller Brass Co. ("MBC") and debtor Quick Fitting, Inc. ("QFI") in QFI's state Receivership Proceeding (the "Receivership"). MBC's complaint and its motion to dismiss Crompton's counterclaims concede all that is necessary for this Court to conclude, as a matter of law, MBC cannot show any damages on its breach of guaranty claim because there is no remaining liability on the underlying debt secured by that guaranty.

## PRELIMINARY STATEMENT

The purpose of a personal guaranty for a secured loan is to provide assurance of an alternative source of payment if the collateral (or proceeds from its sale) proves inadequate to satisfy the full amount of that loan. (*See* ECF No. 1 ("Compl.") ¶ 22) ("Crompton, individually, executed a personal guaranty of the Antipodes Loans").) In the instant case, the assets of QFI— the collateral that secured two loans for which Crompton had given a Personal Guaranty (the "Guaranty") to Antipodes Acquisitions Limited ("Antipodes") (collectively, the aforementioned "Antipodes Loan")—generated sales proceeds in the Receivership that exceeded *by millions of dollars* the amount of *all* of its secured debt. QFI's Receiver also has stated publicly that the *unsecured* creditors may stand to receive some portion of QFI's remaining assets.

Notwithstanding the fact the Antipodes Loan was always fully secured by QFI's assets, MBC, an alleged assignee of the Antipodes Loan, filed this lawsuit last year seeking a payment from Crompton via the Guaranty. (Compl.) And, in recent months, as part of a voluntary settlement by MBC, QFI's Receiver did, in fact, remit to MBC an approximately $9.5 MM payment that is more than sufficient to fully satisfy QFI's loan with JP Morgan in the first position of priority (the "JPM Loan"), which MBC also had assumed, *and* the Antipodes Loan in the second position of

priority. Given these facts—which are not disputed by MBC—it is difficult to see how MBC has any damages or why Crompton continues to face liability here.

Even if application of the sale proceeds of collateral to secured debt in the order of priority does not resolve this case, both Tennessee law and Rhode Island law on application of settlement proceeds unquestionably do.[1] For over one hundred years, the law in Tennessee has been that where, as here, there is no valid application of proceeds by the parties, the court is obligated to apply payments by the debtor *first* to senior debt secured by a personal guaranty. *Blackmore v. Granbery*, 98 Tenn. 277, 39 S.W. 229 (1897). Rhode Island law similarly applies payments to mature debt, consistent with rules of priority. Although MBC attempted to re-allocate the payments to secure a windfall by leaving a liability only on the debt secured by Crompton's Guaranty, no valid application was made because *both QFI's Receiver and the court presiding over QFI's Receivership explicitly rejected MBC's self-serving proposal* and neither MBC nor QFI proposed an alternative one (*See* RHODE ISLAND SUPERIOR COURT ORDER, entered May 25, 2021, attached hereto as **Exhibit A** (the "ORDER") at ¶ 5[2] (declining to approve "Mueller's allocation").) It thus is left to this Court to follow *Blackmore* and its progeny, or well-established Rhode Island law, and apply the payments to satisfy the second-in-priority loan secured by the Guaranty.

Any application that does not fully satisfy the Antipodes Loan would subordinate its second-in-position secured status. (Compl. ¶¶ 20, 22 (Crompton's Guaranty secured the Antipodes

---

[1] This memorandum discusses Tennessee and Rhode Island law on this point because MBC asserts "the Antipodes-related debt —including the Personal Guaranty—was being assigned to, and would be payable in, Tennessee" (ECF No. 29, at 9, n.8), the Settlement Agreement contains a choice-of-law provision suggesting that Rhode Island law may apply, (ECF No. 63-3 ¶ 9), and the Guaranty's choice-of-law provision choosing New Zealand law extends to construction of its terms. (ECF 63-2 ¶ 17). This Court need not resolve this choice because the effect is the same.
[2] All citations herein to filings in the Rhode Island Receivership Proceeding are formatted in small caps and include the filing/entry date, *e.g.*, RECEIVER'S FIRST INTERIM REPORT, filed Feb. 8, 2021.

2

Loan in the second position of priority).) But QFI did not consent to such subordination—in fact, QFI's Receiver refused to accept MBC's proposed application and QFI's security agreements with MBC expressly preclude it. Just as a payment application that pays off *junior* debt from the sale proceeds of QFI's assets—let alone one that allows *unsecured* creditors to be paid—relieves QFI of its liability under the note, so too does it for Crompton. Indeed, failure to satisfy the Antipodes Loan under these circumstances would increase Crompton's liability and fundamentally change the very nature of the Guaranty he provided to Antipodes.

Finally, even accepting MBC's own improper, self-serving allocation of settlement proceeds, the claim must be dismissed because MBC cannot show damages. It is undisputed that the underlying loan was fully secured by QFI's assets and any claimed reduction of QFI's indebtedness—here, as a result of a release of liability by QFI—must be credited to Crompton, making MBC whole.

## PROCEDURAL HISTORY

MBC filed this action on July 10, 2020. (Compl.) MBC's Complaint asserts that Crompton breached the provisions of a Guaranty that he provided to Antipodes to secure two loans between QFI and Antipodes in exchange for Antipodes' then first-in-position secured loans moving to the second position. (Compl. ¶ 21, 22.) Prior to the commencement of this litigation, QFI entered Receivership proceedings in the Rhode Island Superior Court. (*Id.* ¶ 6.)

On August 31, 2020, Crompton filed a Motion to Dismiss the Complaint on procedural grounds and to stay the action. (ECF No. 21), which the Court denied on May 12, 2021. (ECF No. 47.) On May 26, 2021, Crompton filed an Answer, Counterclaim and Third-Party Complaint, adding Mueller Industries Inc. ("MLI") as a third-party defendant. (ECF No. 50.) Thereafter, on July 16, 2021, MBC and MLI (collectively, the "Mueller Defendants") filed nearly identical Motions to Dismiss Crompton's Counterclaims for failure to state a claim. (ECF Nos. 64, 65.)

3

While this federal lawsuit proceeded, MBC elected to negotiate a settlement with QFI's Receiver as to its secured and unsecured debt. In June 2021, the Superior Court presiding over the Receivership entered Final Judgment on its Order authorizing the Receiver to settle with MBC. (ORDER.) The Court approved *only* the aggregate payment of $9,487,500 to MBC and explicitly disavowed any endorsement or approval of MBC's sought-after allocation of settlement proceeds to the three pieces of secured debt it held. (ORDER ¶ 5.)

Crompton filed an Amended Counterclaim and Third-Party Complaint on August 6, 2021. (ECF No. 65.) The Mueller Defendants again sought dismissal of the counterclaims and third-party claims on nearly identical grounds as it did before. (ECF Nos. 66 (MBC Motion to Dismiss), 67 (MLI Motion to Dismiss).) Those claims remain open and briefing is underway, but the pleadings with respect to MBC's Complaint against Crompton and its breach of the personal guaranty claim have closed. Crompton accordingly moves here for judgment on the pleadings, or in the alternative for dismissal on mootness grounds.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 12(c) allows parties to move for judgment on the pleadings with respect to pleadings that are closed, as long as the motion will not delay trial. Fed. R. Civ. P. 12(c). "The standard of review for a judgment on the pleadings is the same as that for a motion to dismiss under Federal Rule of Civil Procedure 12(b)(6)." *Monroe Retail, Inc. v. RBS Citizens, N.A.*, 589 F.3d 274, 279 (6th Cir. 2009); *Williams v. United States*, 754 F. Supp. 2d 942, 946 (W.D. Tenn. 2010). Rule 12(c) and Rule 12(b)(6) authorize a court to dismiss a claim on the basis of a dispositive issue of law. *Neitzke v. Williams*, 490 U.S. 319, 326 (1989).

As MBC recognizes (ECF No. 66-2 at 15, n.9), "fairness and efficiency" allows a court to consider all available pleadings, including documents incorporated by, or referred to in the

pleadings, documents attached to the complaint or motion for judgment on the pleadings, public records, and matters of which the court may take judicial notice, including documents filed in other lawsuits. *In re Omnicare, Inc. Sec. Litig.*, 769 F.3d 455, 466 (6th Cir. 2014); *Davis v. City of Memphis Fire Dep't*, 940 F. Supp. 2d 786, 801 (W.D. Tenn. 2013).

Motions to dismiss on grounds of mootness are properly brought under Rule 12(b)(1) of the Federal Rules of Civil Procedure and such motions may be brought "at any time." *See* Fed. R. Civ. P. 12(h)(3). "Mootness results when events occur during the pendency of a litigation which render the court unable to grant the requested relief." *Carras v. Williams*, 807 F.2d 1286, 1289 (6th Cir. 1986); *Cleveland Branch, N.A.A.C.P. v. City of Parma, Ohio*, 263 F.3d 513, 530 (6th Cir. 2001) (a case becomes moot when "interim relief or events have completely and irrevocably eradicated the effects of the alleged violation"); *Fishon v. Mars Petcare US, Inc.*, 501 F. Supp. 3d 555, 563 (M.D. Tenn. 2020) (to establish Article III standing, plaintiff must allege that he "suffered an injury in fact"). "[A] court has broad discretion with respect to what evidence to consider in deciding whether subject matter jurisdiction exists, including evidence outside of the pleadings[.]" *Cartwright v. Garner*, 751 F.3d 752, 759 (6th Cir. 2014). The burden of demonstrating mootness rests on the party claiming mootness. *Cleveland Branch*, 263 F.3d at 531.

## STATEMENT OF FACTS

### I.     The Parties: MBC and Crompton

Plaintiff Mueller Brass Co. is a corporation organized under the laws of the State of Michigan with a principal place of business and headquarters located in Collierville, Tennessee. (Compl. ¶ 1.)

Defendant David Crompton is the former President, CEO and majority shareholder of QFI, a corporation incorporated and headquartered in Rhode Island. (Compl. ¶ 5.)

II.     **The Antipodes Loan**: Antipodes Provides Loans to QFI Secured By QFI's Assets

In April 2019, QFI obtained a loan from Antipodes Acquisitions Limited, a New Zealand company, evidenced by two promissory notes, one denominated in New Zealand Dollars and the other in Japanese Yen (collectively, the "Antipodes Notes"), as well as a Loan Agreement (collectively, the aforementioned "Antipodes Loan"). (*See* Compl. ¶¶ 13–15; Exhibit A to Compl., ECF No. 1-1.) In U.S. dollars, the total amount of the Antipodes Loan was $2,875,525.23. (Compl. ¶ 13 n.1, n.2; ECF No. 1-1 at PageID 13, 20.)

Integral to the Antipodes Loan was a Security Agreement executed concurrently with the Antipodes Loan whereby QFI granted Antipodes a security interest in all the assets of QFI. (*See* ECF No. 1-1 at PageID 28–29, 50–51.) There is no allegation of any additional indebtedness to Antipodes on the part of QFI.

III.    **The Personal Guaranty**: Crompton Provides Guaranty to Antipodes in Exchange for Antipodes Subordinating Its Priority Position Behind a New Loan

In August 2019, QFI obtained a $4 million loan from JP Morgan Chase Bank N.A. ("JP Morgan"), which was designed to provide QFI with working capital (the "JPM Loan"). (Compl. ¶ 16.) As a requirement of the JPM Loan, JP Morgan demanded a first priority security interest in QFI's assets. (*Id.* ¶ 19.) Because the Antipodes Loan was then first in time and senior secured debt, JP Morgan required Antipodes to execute a Subordination Agreement giving JP Morgan lien priority over the Antipodes Loan. (*Id.* ¶ 20.) Before Antipodes would agree to the subordination of its senior secured position, Antipodes required that Crompton provide a personal guaranty of payment as additional security for the Antipodes Loan. (*Id.* ¶ 21.)

On September 4, 2019, QFI and Antipodes executed a First Amendment and Note Modification Agreement with respect to the Antipodes Notes and Loan Agreement, which referenced the Subordination Agreement with JP Morgan, the Personal Guaranty, and the newly

subordinated, second-in-priority secured position of the Antipodes Loan. (Compl. ¶ 23; Exhibit C to Compl., ECF No. 1-3 at PageID 65-66.)[3]

The loan transaction was finalized when Crompton executed a personal guaranty of the newly subordinated Antipodes Loan in the second-in-priority secured position. (Compl. ¶¶ 20, 22.)

## IV.   <u>The Mueller Loan</u>: MBC Provides QFI a Secured Loan That Is Subordinate to the JPM and Antipodes Loans and Which Cannot Be Paid Before Senior Debt

On March 31, 2020, MBC and QFI executed a Credit Agreement which established a $4 million working capital fund the ("Mueller Loan") upon which QFI could draw for continued business operations. (Compl. ¶ 32.) Among its requirements was an Intercreditor and Subordination Agreement by/among QFI, MBC, JP Morgan, and Antipodes, executed the same day (the "Intercreditor Agreement"). The Intercreditor Agreement expressly defined this loan as the "Subordinated Loan" having a third-in-priority security interest in QFI's assets after the JPM Loan and Antipodes Loan, respectively. (Attached hereto as **Exhibit B** ("Ex. B") at 1–2, 3 ¶ 3.)

The Intercreditor Agreement expressly affirmed that any payments received from QFI would be applied first and exclusively to the senior JPM Loan and Antipodes Loan until said senior loans were paid in full. (Ex. B at 4 ¶ 6 ("At no time while either of the Senior Loans remains outstanding shall Borrower pay or cause to be paid to any holder of the Subordinated Loan …").) The Intercreditor Agreement also addressed the priority of proceeds from the sale or liquidation of QFI's assets, and explicitly mandated that any such proceeds be applied to the respective loans in order of priority. (Ex. B at 4 ¶ 7 ("any proceeds realized on any liquidation of Borrower's Collateral or sale of equity of Borrower pursuant to the Subordinated Loan Agreement are the same as the priorities set forth [herein]").) Finally, the Intercreditor Agreement mandated that the subordinated

---

[3] This memorandum will continue to refer to the loan secured by the Guaranty as the "Antipodes Loan" despite its amendment.

status of the Subordinated Mueller Loan would remain in full force and effect until the JPM Loan and the Antipodes Loan were paid in full. (Ex. B at 6 ¶ 10.)

V.   <u>**MBC's Secured Debt**</u>: **MBC Purchases the JPM Loan and Antipodes Loan**

On April 15, 2020, MBC purchased the JPM Loan from JP Morgan for $4,000,000.00 plus $34,416.13 in unpaid and accrued interest.  (Compl. ¶¶ 24–26.)  In exchange, JP Morgan assigned to MBC all of JP Morgan's rights and interests in the JPM Loan, including the first-in-priority security interest in QFI's assets provided under the JPM Loan. (*Id*. ¶ 27.)

On May 1, 2020, MBC purchased the Antipodes Loan pursuant to an Antipodes Assignment and Acceptance ("Antipodes Loan Assignment").  (*Id*. ¶ 29; Exhibit D to Compl., ECF No. 1-4.)  The assignment by QFI  to MBC did not alter the Antipodes Loan's second-in-priority security interest in QFI's assets.  (Compl. ¶ 30; ECF No. 1-4 at PageID 77.)[4] Nor did it alter the terms of the Intercreditor Agreement or the subordinated Mueller Loan.

VI.   <u>**QFI Receivership**</u>: **QFI Enters Receivership with Assets that are More Than Sufficient to Satisfy Its Secured Debt**

In June 2020, QFI entered Receivership and a permanent Receiver was named. (*See* PETITION TO COMPROMISE, attached hereto as **Exhibit C** ("PETITION"), at ¶¶ 2–3.) On October 1, 2020, MBC filed a PROOF OF SECURED CLAIM in the Receivership for each of the three secured loans it held. (PETITION ¶ 8.)

In December 2020, the QFI Receiver closed on the sale of QFI's assets, generating proceeds of $23,000,000, plus a $1,000,000 promissory note from the court-approved buyer.  (*See* RECEIVER'S FIRST INTERIM REPORT, filed February 8, 2021, attached hereto as **Exhibit D** ("RECEIVER'S REPORT") at ¶¶ 48–49.) Once other receipts were added, "the Receiver had total

---

[4] QFI—but not Crompton personally—consented to the assignment of the loan to MBC. (Compl. ¶¶ 29, 31; ECF No. 1-4 at PageID 73.)

receipts of $27,147,685.23 and made total disbursements of $8,554,783.40, leaving cash on hand in the amount of $18,592,901.83." (Ex. D at 15 ¶ 50.)

## VII.  **MBC Settlement**: MBC Receives $9,487,500 in Settlement of its Claims

Following the December 2020 sale, the QFI Receiver and MBC engaged in negotiations regarding MBC's secured and unsecured claims and QFI's potential lender liability claims based on QFI Receiver's evaluation of MBC's conduct. (PETITION ¶¶ 13, 18.) When the parties reached settlement terms in May 20121, the loans comprising MBC's secured claims and updated calculations for the amounts claimed were as follows:

| | |
|---|---|
| Secured JPM Loan (First-in-Priority) | $4,153,995.76 |
| Secured Antipodes Loan (Second-in-Priority) | $3,280,730.74 |
| Subordinated Mueller Loan (Third-in-Priority) | $2,436,955.52 |
| **Total under Loans:** | **$9,871,682.02** (includes interest and late fees) |
| Attorneys' fees & costs | $651,077 |
| **Total Claimed:** | **$10,522,759.02** |

(PETITION ¶ 7.)

The PETITION stated that MBC had agreed to a payment in the amount of $9,487,500 to settle its secured claims. (PETITION ¶ 19.)  Applied to MBC's secured claims in the order of priority of each underlying loan, the $9,487,500 payment proceeds fully satisfied the first position JPM Loan and the second position Antipodes Loan, which together totaled $7,434,726.50. Application of the remaining $2,052,773.50 in payment proceeds to the $2,436,995.52 owed under the Subordinated Mueller Loan would result in a deficiency of $384,182.02 on the third position subordinated debt, excluding MBC's claim for attorney's fees and costs.[5]

---

[5] MBC claimed QFI owed $651,007 in attorney's fees and costs, pursuant to the secured loans. (PETITION ¶ 7.)  Apportioning this request equally adds $217,025.67 to the amounts owed for each loan, resulting in combined obligation of $7,868,777.84 for the JPM Loan and Antipodes Loan— an amount again that is fully satisfied by the Receiver's $9,487,500 payment.  (*See* PETITION ¶ 19.)

MBC, however, proposed to allocate QFI's payment proceeds contrary to the order of priority and instead provide for *overpayment* of its other loans and *underpayment* of the loan for which Crompton gave the Guaranty:

| Secured Loan (Priority) | Amount MBC Claimed | MBC Proposed Allocation | Allocation Result |
|---|---|---|---|
| JPM Loan (first in priority) | $4,153,995.76 | $4,479,534.00 | *Overpayment* $325,538.24 |
| Antipodes Loan (second in priority) | $3,280,730.74 | $2,245,472.00 | *Underpayment* $1,035,258.74 |
| Mueller Loan (third in priority) | $2,436,955.52 | $2,762,494.00 | *Overpayment* $325,538.48 |

(*See* PETITION ¶ 19 and Exhibit 1 to PETITION (PROPOSED SETTLEMENT AGREEMENT) at 2–3.)

The explanation MBC provided to the Court was that although its claims were fully secured, its reduction in QFI's indebtedness was in exchange for a release of liability for claims QFI had against it arising out of the Antipodes Loan: "it was logical and appropriate for Mueller to allocate the Settlement discount to the Antipodes Loans (as opposed to the JPM and Mueller Loans which did not, in Mueller's view and based on discussions with the Receiver, carry similar litigation risk)." (*See* RESPONSE OF MUELLER TO OBJECTION TO PETITION TO COMPROMISE, attached hereto as **Exhibit E**, at 4; ECF No. 66-3 ("For and in consideration of this Agreement … and upon Mueller's receipt of the Settlement Amount, the Receiver, on behalf of himself and QFI, … agree to discontinue any present, and not make any future claims … otherwise relating to the relationship between Mueller and QFI including but not limited to lender liability claims.").)

## VIII. <u>Receivership Court Order</u>: Court Refuses to Accept MBC's Allocation, Approves Only the Aggregate Settlement Amount, and Makes No Application of Proceeds

QFI's Receiver refused to agree to MBC's allocation. At the hearing to approve the settlement, the Receiver objected to Mueller's self-serving allocation and the Receivership Court explicitly declined to approve it, and, aware of this litigation over Crompton's Guaranty, ensured that the Receivership record was clear for "a judge in Tennessee" that ***no*** application of settlement

payments was being made by the Court, let alone the one proposed by MBC.  (*See* Hearing Transcript, dated May 17, 2021, attached hereto as **Exhibit F** ("Hearing Tr.") at 25:11-16 (directing counsel to include specific language in the order "so that you're not litigating in Tennessee the issue of whether this Court has approved that allocation because I am not approving the allocation. I am approving the total settlement."); Hearing Tr. 23:15-17 (stating "I don't know what a judge in Tennessee is going to do so let's make it clear and precise, okay?").)

Consistent with the hearing, the Receivership Court's Order and final judgment approved the $9,487,500 aggregate payment and explicitly rejected MBC's proposed allocation:

> ***Nothing herein***, in the Settlement Agreement ***or in any final judgment*** hereon, ***reflects the Receiver's or the Court's position as to, or approval of, Mueller's allocation of the settlement payment*** made by the Receiver to Mueller under the Settlement Agreement, and this Order and the approval of the Court as set forth herein ***shall constitute an approval and ratification only of the aggregate settlement amount*** in connection with all of Mueller's claims against the receivership estate and the claims of the Receiver against Mueller.

(ORDER ¶ 5) (emphases added).)

## IX.   Anticipated Distribution to *Unsecured* Creditors: Receiver Moves to Close the Claims Period, Expects Remaining Pool of Assets Will Pay QFI's Unsecured Debt

The Receiver recently stated that "there is likely to be at least a partial distribution for each of the classes of claims already filed in this matter," which would include unsecured claims. (*See* MOTION FOR CLAIMS BAR DATE, filed July 8, 2021, attached hereto as **Exhibit G**, ¶ 11.)

**SUMMARY OF ARGUMENT**

There are three independent grounds for dismissal.

First, MBC's breach of guaranty claim fails because QFI's settlement payment—comprised of proceeds from the sale of QFI's assets—to MBC satisfied the underlying debt secured by the Guaranty. This is so whether this Court applies well-settled rules of priority of secured debt, or long-standing Tennessee law directing this Court to appropriate debtor payments ***first*** to a debt secured by a personal guaranty. Under either theory, Crompton has no liability

remaining under the Guaranty and MBC cannot show damages. (ECF No. 66-1 at 14 (MBC acknowledges that allocation of the settlement proceeds bears upon the amount of damages).)

Second, MBC's claim may be dismissed because no liability remains on the loan secured by the Guaranty unless the settlement payment is applied in a way that would destroy the loan's second-in-position, secured status. Because neither QFI nor Crompton consented to that subordination—and, in fact, QFI's agreements with MBC preclude it—MBC's action in changing the priority independently relieves each party of any payment obligations. Any other result would impermissibly increase Crompton's liability under the Guaranty and materially change the terms and conditions under which Crompton provided it. MBC's consolidation of its three pieces of debt and attempt to fund debt not covered by the Guaranty is likewise both unfair and improper.

Third, even accepting MBC's own improper, self-serving allocation of settlement proceeds—a point Crompton, of course, does not concede—MBC cannot show relief can be granted because MBC has no damages as a matter of law. MBC admits that the sale of QFI's assets generated more than sufficient funds to satisfy all of QFI's secured debt. It also is undisputed that the loan secured by the Guaranty was 100% secured by QFI's assets, including while QFI was in Receivership. MBC cannot change this dispositive fact by settling with QFI and then claiming a loan deficiency for Crompton to pay under the Guaranty. This is because any claimed reduction in QFI's indebtedness—here, a purported discount on the outstanding balance of the Antipodes Loan in exchange for MBC's receipt of a release of liability from QFI—must be credited to Crompton.

## **ARGUMENT**

## I. **THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE QFI'S SETTLEMENT PAYMENT FULLY SATISFIED THE UNDERLYING DEBT**

The complaint should be dismissed because the settlement payment from QFI's Receiver to MBC, comprised of proceeds from the sale of QFI's assets, satisfied the secured debt guaranteed

by Crompton. This Court may reach this conclusion by applying proceeds of collateral under well-established rule of priority, or by following either long-standing Tennessee law that directs this Court to apply settlement proceeds *first* to the loan secured by Crompton's Guaranty, or Rhode Island law that applies debtor payments in order of secured seniority. And, where the underlying debt by the debtor has been paid, a personal guarantor securing that debt has no liability. *See Cumberland Bank v. G & S Implement Co.*, 211 S.W.3d 223, 231 (Tenn. Ct. App. 2006) ("[U]nder the common law, the liability of a guarantor is discharged when the underlying debt has been paid in full."); *Wallace Hardware Co., Inc. v. Abrams*, 223 F.3d 382, 401 (6th Cir. 2000) (guarantors are liable only to the extent that the principal debtor was liable) (citing *Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439, 1449 (6th Cir.1993) and *Rhode Island Hosp. Trust Nat'l Bank v. Ohio Casualty Ins. Co.,* 789 F.2d 74, 78–79 (1st Cir. 1986)).

### A. QFI's Payment of $9,487,500 from the Sales of Its Assets Satisfies the Antipodes Loan

MBC makes four key concessions in its Complaint and filings. MBC first concedes that Crompton's Guaranty secured the Antipodes Loan. (Compl. ¶ 22 ("Crompton, individually, executed a personal guaranty of the Antipodes Loans").) MBC next concedes that the Antipodes Loan is secured by QFI's assets in the second order of priority. (*Id*. ¶ 20 (Crompton provided guaranty in exchange for subordinating the Antipodes Loan behind the JPM Loan).) MCB further concedes and incorporates that order of priority in its SETTLEMENT AGREEMENT with QFI's Receiver. (SETTLEMENT AGREEMENT at 1 ("Mueller has asserted a first, second and third priority, perfected security interests in all assets of QFI").) MBC lastly concedes that it received approximately $9.5 MM in proceeds from the sale of QFI's assets. (ECF 66-1, at 3.)

These concessions are fatal to its claim because "if a lien is perfected, it must be satisfied out of the asset(s) it encumbers before any proceeds are available to unsecured claimants." *In re SPM Mfg. Corp.*, 984 F.2d 1305, 1312 (1st Cir. 1993); *In re Darnell*, 834 F.2d 1263, 1265 (6th

13

Cir. 1987) (citing Collier on Bankruptcy ¶ 507.02[2] (15th ed. 1985)); *In re Two Springs Membership Club*, 424 B.R. 808, 814–15 (Bankr. N.D. Ohio 2010) ("[a] secured claim by its very nature is entitled to be paid in full out of the proceeds of the collateral that secures it") (quoting Fundamentals of Bankruptcy Law 289 (A.L.I. 2d ed. 1991)). And, of course, "competing perfected interests must be prioritized according to the rule 'first in time, first in right.'" *Darnell*, at 1266; *see also In re Tate*, No. 99-31027, 2000 WL 33912550, at *3 (Bankr. E.D. Tenn. Mar. 2, 2000).[6]

Straightforward arithmetic and application of the rules above show that the underlying debt secured by the Guaranty has been fully satisfied through the settlement payment from QFI to MBC. The undisputed record shows that MBC received $9,487,500 in proceeds from QFI, and the total amount due on the JPM Loan (in the first order of priority) and Antipodes Loan (in the second order of priority) is $7,434,726.50. Therefore, applying the sale proceeds from QFI's assets to QFI's debt secured by those assets in the proper order results in a full satisfaction of the Antipodes Loan. That QFI's *unsecured* creditors stand to be paid from QFI's assets, (Ex. G ¶ 9), further compels the conclusion that the Antipodes Loan has been fully satisfied. *Czyzewski v. Jevic Holding Corp.*, 137 S.Ct. 973, 983 (2017) (holding "priority is an absolute command—lower priority creditors cannot receive anything until higher priority creditors have been paid in full").[7]

---

[6] Application of these principles is particularly appropriate here because Crompton provided the Guaranty as part and parcel of a transaction to subordinate existing secured debt, rather than as a wholly separate undertaking; the former never would have existed without the latter. (*See also* Compl. ¶ 53 (demanding payment as a secured party under the UCC).)

[7] This Court need not reach this issue, but MBC successfully argued that the UCC and all applicable bankruptcy priority rules applied to the Receivership. (*See, e.g.*, ECF No. 21-5 PageID 199–200.) MBC therefore should be judicially estopped from asserting any allocation outside the order of priority. *See* Ed*wards v. Aetna Life Ins. Co.*, 690 F.2d 595, 599 (6th Cir. 1982) (finding estoppel where the estopping position and the estopped position are directly inconsistent and the party succeeded in persuading a court to accept its prior position).

14

**B.  Under Long-Standing Tennessee Law and Rhode Island Law, Application of QFI's Settlement Payment Satisfies the Antipodes Loan**

There is another basis for concluding the MBC has received full payment for the Antipodes Loan. Although MBC attempted to do so, neither the settlement agreement nor the Receivership Court applied the settlement proceeds to the secured debt held by MBC. (*See* ORDER ¶ 5.) Under those circumstances, Tennessee law and Rhode Island law direct this Court to apply QFI's payment to fully satisfy the senior Antipodes Loan secured by Crompton's Guaranty. *See Crossville, Inc. v. Kemper Design Ctr., Inc.*, 758 F. Supp. 2d 517, 531 (M.D. Tenn. 2010) (application of proceeds is an equitable issue for the court and, applying the long-standing Tennessee rule of application in *Blackmore v. Granbery*, 39 S.W. 229 (Tenn. 1897), preference must be given to a debt secured by a personal guarantee, particularly one that has priority status); *Apple Valley Mall, LLC v. Floyd Realty Co.*, No. 97-4157, 1998 WL 182657, at *9 (R.I. Super. Mar. 30, 1998) (where "neither party made a proper application," court applies payment to the "earliest matured debts").

Long ago, when presented with similar circumstances, the Tennessee Supreme Court rejected the common law rule of giving preference to "the most precarious debt" and instead adopted the civil rule that directs courts to apply collateral proceeds first to older debts for which there was a surety, rather than to the younger debts for which there were none. *Blackmore*, 39 S.W. at 230–31. The *Blackmore* court explained that payments should be "applied to discharge debts for which a surety is bound, rather than to one where the debtor has given no surety, on the principle that the debtor's honor is more concerned in debts on which he has given security than in those where he alone is bound, and to an old debt before a new one." *Id*. at 230 (citing cases).[8]

---

[8] Other states recognize the same rule as applied in Tennessee. *See, e.g.*, *Sec. Tr. & Sav. Bank v. June*, 1 P.2d 970, 971–72 (Ariz. 1931) ("The general rule of law, of course, is that in the absence of direction by the debtor, a creditor may apply payments made by the former to such portion of the debt as he prefers[.]*** When, however, the collateral is pledged for the security of a specified debt, for which a guaranty has also been given by a surety, the majority rule is that the proceeds*

15

Here, because collateral (the assets of QFI) has been pledged for the security of a specified debt (the Antipodes Loan), for which a guaranty has also been given (Crompton's Guaranty), this Court must apply the payment *first* to priority debt secured by the personal guaranty rather than any unguaranteed debt. *See Blackmore*, 39 S.W. at 230 ("application ought to be made to the debt for which the debtor has given securities, rather than to those he owes singly"); *Crossville*, 758 F. Supp. at 531 ("Payments will be applied to discharge debts for which a surety is bound, rather than to one where the debtor has given no surety.") (citing 20 Tenn. Jur. *Payment* § 13)); *see also F.D.I.C. v. Thornton*, 595 F. App'x 513, 521 (6th Cir. 2014) (recognizing that *Blackmore* and *Bussey v. Gant's Adm'r*, 29 Tenn. 238 (1849) require payments to be "applied to discharge debts for which a surety is bound").

Rhode Island law likewise applies settlement proceeds to secured debt consistent with the order of priority discussed above. *Apple Valley Mall, LLC*, 1998 WL 182657, at *9. This application, too, satisfies Crompton's payment obligations, leaving MBC without damages.[9]

## II.   THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE ANY APPLICATION THAT SUBORDINATES THE ANTIPODES LOAN OUT OF ITS SECOND POSITION IS IMPERMISSIBLE

Even if the underlying debt has not been fully satisfied by QFI's payment, this Court cannot grant relief to MBC because the allocation of the $9.5 MM settlement proceeds in a way that does

---

*of the collateral cannot be first applied by the creditor to a debt not embraced by the pledge, without the consent of the surety*.") (emphasis added).

[9] Even if MBC had discretion to apply QFI's payment, equitable principles would not permit MBC to allocate it in a way that does not satisfy the Antipodes Loan. *See Bussey*, 29 Tenn. at 242 ("The right of the creditor to apply the payment is not unlimited. *** There are cases in which, though the payment be general, the creditor is not allowed to apply the payment to which account he pleases."); *Apple Valley Mall*, 1998 WL 182657, at *8 ("creditor is also subject to the duty of good faith and fair dealing" and court may decline creditor's application "when, from the circumstances surrounding the case, it appears that their application would be inequitable or unjust").

not satisfy the Antipodes Loan would impermissibly subordinate its second-in-position secured status, contrary to both MBC's agreements with QFI and the Guaranty itself.

## A. Subordination of the Antipodes Loan Independently Discharges QFI's and Crompton's Payment Obligations

The Agreements between QFI and MBC, including the Antipodes Notes, Security Agreement and Intercreditor Agreement, which are incorporated by the Guaranty between Crompton and Antipodes, expressly provide that in the event of QFI's insolvency, QFI's assets must satisfy the JPM Loan first, the Antipodes Loan second, and any other junior debt next. (*See supra* at 7–8.)  MBC also recognizes that Crompton's obligation to pay under the Guaranty *only* is triggered if QFI does not have sufficient assets remaining to pay the second-in-position Antipodes Loan after covering the first-in-position JPM Loan. (Compl. ¶¶ 20, 22.)

Any subordination of the Antipodes Loan to allow for payment on the third-in-position Mueller Loan—let alone an application that allows QFI's assets to pay *unsecured* creditors— violates the terms of QFI's agreements with MBC and Crompton's Guaranty. Such action would serve to discharge not only the principal debtor, but the guarantor as well, as it would fundamentally alter and substantially increase Crompton's liability under the Guaranty without consideration, and be wholly inconsistent with the purpose for which Crompton agreed to guaranty the Antipodes Loan in the first place. *Crossville*, 758 F. Supp. 2d at 527 (discharging guarantor due to fundamental change in the nature of the risk); *Davis v. JT Bldg.*, No. PB07-4683, 2010 WL 4551605, at *7 (R.I. Super. Nov. 5, 2010) (the rule is "that a material alteration in the original contract by the parties thereto without the consent of the surety or guarantor releases such surety

or guarantor" and observing that "[t]his rule protects a guarantor from alterations which increase the guarantor's risk over that which was assumed in the original agreement")[10]

### B. MBC's Consolidation of Its Debt Voids the Guaranty

Equally so, MBC's treatment of its debt—essentially consolidating it in the settlement and unilaterally seeking to reorder the priority to benefit solely itself—likewise voids the Guaranty. Numerous courts have held that such conduct of the creditor discharges any payment obligations. *See*, *e.g.*, *Univ. Bank and Tr. Co. v. Dunton*, 655 F.2d 23, 24–25 (1st Cir. 1981) (releasing personal guarantor due to the bank's application of the proceeds of collateral to three subsequent unguaranteed loans); *Eagerton v. Vision Bank*, 99 So. 3d. 299, 308–10 (Ala. 2012) (consolidation of guaranteed loan with unguaranteed loan created new indebtedness and discharged guarantors); *Bridge Fin. Corp. v. Bird*, No. G035430, 2006 WL 515529, at \*5 (Cal. Ct. App. Mar. 3, 2006) (combining indebtedness of unguaranteed loan with guaranteed loan unilaterally modifies the contract); *Emrick v First Nat'l Bank*, 756 N.E.2d 914, 917 (Ill. App. 2001) (rejecting creditor's application of collateral proceeds leaving guarantor liable for deficiency for combined loans).

### III.   THIS COURT SHOULD DISMISS THE COMPLAINT BECAUSE MBC CANNOT SHOW DAMAGES BECAUSE ANY REDUCTION OF QFI'S INDEBTEDNESS AS A RESULT OF THE SETTLEMENT MUST BE CREDITED TO CROMPTON

Even accepting MBC's own self-serving allocation of settlement proceeds, the Complaint should be dismissed because MBC lacks damages. Although MBC continues to claim in this

---

[10] *See also Citizens Bank v. Lair*, 687 S.W.2d 268, 271–72 (Mo. Ct. App. 1985) ("If the change enlarges or lessens the liability, it is material and vitiates the contract," and concluding bank did not act in good faith when applying proceeds of collateral to loans not guaranteed by guarantor); *Webb v. Finger Cont. Supply Co.*, 447 S.W.2d 906, 908 (Tex. 1969) (subordination destroys nature of the obligation which guarantor guaranteed and observing "[t]he power to modify anything does not imply a power to substitute a thing entirely different"); *Indiana TelcoFederal Credit Union v. Young*, 297 N.E.2d 434, 436 (Ind. App. 1973) (following rule that "when a principal alters the terms of the contract without the consent of the surety, the surety is discharged"); *Exch. Nat. Bank of Chicago v. Bergman*, 505 N.E.2d 1236, 1238 (Ill. App. 1987) (guarantor released where creditor applied debtor's $85,000 payment to separate loan).

lawsuit that it did not receive full payment on the debt secured by Crompton's Guaranty after its settlement with QFI's Receiver, any claimed reduction of QFI indebtedness—here, as a result of a release of liability MBC received from QFI—must be credited to Crompton. *Wallace Hardware Co*, 223 F.3d at 406 (value of release of liability debtor provided to creditor must be credited to guarantor). MBC therefore has been made whole, has no damages, and lacks standing. *Benefit Consulting All., LLC v. AIG Life Ins. Co.*, No. 3:07-1136, 2008 WL 11510630, at *6 (M.D. Tenn. Sept. 26, 2008) (where complaint alleged defendant owed $300,000, but plaintiff received an aggregate amount of $300,000 from different sources, plaintiff had not sustained an "injury in fact" and lacks standing).

### A. The Antipodes Loan Was Fully Secured by QFI's Assets and Any Reduction of QFI's Indebtedness Created by MBC's Settlement Must Be Credited to Crompton

It is undisputed that QFI had more than sufficient assets to satisfy MBC's claims for QFI's secured debt, including the Antipodes Loan. (*See supra* at 8–9.) Had the Receivership simply run its course, there would have been no debt remaining on the Antipodes Loan and, by extension, no liability under Crompton's Guaranty. MBC did not allow that to happen. Instead, MBC voluntarily agreed to settle its several claims for less than full value.

MBC has self-servingly claimed it sought to settle its claims and discount the indebtedness of QFI on the Antipodes Loan—which would have been fully repaid—due to the threat of litigation by QFI. (*See* Ex. E at 4 ("it was logical and appropriate for Mueller to allocate the Settlement discount to the Antipodes Loans (as opposed to the JPM and Mueller Loans which did not, … carry similar litigation risk).") By MBC's own admission, therefore, QFI's release of liability accounts for any claimed deficiency on the debt secured by the Guaranty.

The value that QFI received—specifically, a reduction of indebtedness on the Antipodes Loan in exchange for providing the release of liability to MBC—belongs also to Crompton,

19

however, as a credit for any amount he might owe MBC under the Guaranty. *See Wallace Hardware*, 223 F.3d at 406 (guarantors "clearly are entitled to this credit against the amount owed under the Guaranty, since any reduction in [the debtor's] indebtedness, whether through a cash payment or any other means, also serves to reduce the [guarantor's] liability under the Guaranty—and this is so even where the reduction is achieved through an agreement to release a claim."). As a result, MBC cannot show damages because MBC: (1) has received a monetary payment from QFI to reduce any amounts due on the debt; and (2) has been made whole for any purported shortfall that it currently seeks from Crompton under the Guaranty through QFI's provision of a release of liability. *See Id*. at 406; 23 Williston on Contracts § 61:11 (4th ed.) ("Any consideration, whether monetary or otherwise, received by the obligee from the principal obligor in payment of the obligation reduces the creditor's entitlement against the secondary obligor."); *Fundex Cap. Corp. v. Rochelle*, No. 05-civ-2972, 2006 WL 547794, at *3 (S.D.N.Y. Mar. 7, 2006) (damages award against guarantor was equal to face amount of primary obligor's debt less all prior payments primary obligor made on such debt); *see also* Restatement (Third) of Suretyship & Guaranty § 19 (1996) ("To the extent that the underlying obligation is discharged by performance or other satisfaction by the principal obligor, the secondary obligation is also discharged.").

## CONCLUSION

MBC alone is responsible for the legal consequences—including mootness and the insufficiency of its claim—based upon its settlement with QFI and the payment it willingly accepted. This Court consequently should enter judgment in favor of Crompton on the pleadings, because MBC cannot show any damages, or it may dismiss this case because MBC cannot show an injury in fact and therefore lacks standing to pursue its claim.

Dated: September 17, 2021

Respectfully submitted,

/s/ Michael J. Sullivan
Michael J. Sullivan (MA No. 487210)
Simon J. Cataldo (MA No. 690879)
*Admitted pro hac vice*
Ashcroft Law Firm
200 State Street, Floor 7
Boston, MA 02109
(617) 573.9400
msullivan@ashcroftlaw.com

Larry Laurenzi (BPR No. 009529)
Sarah Stuart (BPR No. 035329)
Burch, Porter & Johnson, PLLC
130 North Court Avenue
Memphis, Tennessee 38103
(901) 524-5000
llaurenzi@bpjlaw.com
sstuart@bpjlaw.com

*Attorneys for Defendant David Crompton*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served via the Court's ECF system, this 17th day of September, 2021, upon the following counsel of record.

Larry H. Montgomery (TN# 9579)
Aubrey B. Greer (TN# 35613)
6000 Poplar Ave, Suite 400
Memphis, TN 38119
lmontgomery@glankler.com
agreer@glankler.com

/s/ Michael J. Sullivan