**IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF TENNESSEE
WESTERN DIVISION**

MUELLER BRASS CO.,

      *Plaintiff/Counter-Defendant,*

v.                                                                    No. 2:20-cv-02496-SHL-cgc

DAVID CROMPTON,

      *Defendant/Counter-Plaintiff.*

--------------------------------------------

DAVID CROMPTON,

      *Third-Party Plaintiff,*

v.

MUELLER INDUSTRIES, INC.,

      *Third-Party Defendant.*

---

**DAVID CROMPTON'S RESPONSE IN OPPOSITION
TO MUELLER BRASS CO'S MOTION TO DISMISS COUNTERCLAIMS**

---

      Defendant/Counter-Plaintiff/Third-Party Plaintiff David Crompton ("Crompton"), by and through undersigned counsel, hereby files this Response in Opposition to Plaintiff/Counter-Defendant Mueller Brass Co.'s ("MBC") Motion to Dismiss Counterclaims ("Motion").

## <u>INTRODUCTION</u>

      This litigation has been driven by MBC's desire to obtain a knowing windfall from Crompton, by enforcing his personal guaranty of the loan provided to Quick Fittings, Inc. ("QFI"), not by MBC but by Antipodes Investments Limited ("the Antipodes Loan"). The undisputed

1

record shows that the Antipodes Loan was at all times fully secured by the assets of QFI, and, this summer, MBC accepted a payment of $9.5 MM in QFI's Receivership proceeding in Rhode Island (the "Receivership") from QFI's Receiver, fully satisfying the Antipodes Loan by operation of law and leaving MBC without any damages in the instant lawsuit.

For this reason, contemporaneous with the filing of this Opposition, Crompton has moved for judgment on the pleadings, or, in the alternative, to dismiss for lack of standing. MBC's instant motion to dismiss Crompton's counterclaims—many of which, as explained below, were properly brought by Crompton *defensively* as a set off against MBC's claim of liability under the Guaranty per well-established law, *see Wallace Hardware Co. v. Abrams*, 223 F.3d 382, 405–06 (6th Cir. 2000) (collecting cases)—may be partially mooted.

In any event, MBC's procedural arguments for dismissal on the grounds of untimeliness, claim preclusion (*res judicata*) and release based on its settlement agreement with QFI—to which Crompton was not a party and which protected the interests of the Receiver, not Crompton—all lack merit. Not only were lender liability and other claims not litigated against MBC, Crompton, unlike here, lacked standing in the Receivership to litigate them. Nor did the Receivership address the issue of allocation of QFI's settlement proceeds to secured debt held by MBC, the key issue in this case. To the contrary, the Receivership Court made it perfectly clear that it (a) was *not* approving MBC's self-serving, out-of-priority allocation (or, for that matter, *any* allocation by the parties), and (b) was leaving the legal determination to allocate the settlement proceeds to *this* Court in this litigation. MBC's final argument that Crompton's counterclaim is untimely is based on the flawed premise that he could not follow the Rules of Civil Procedure that provides him leave to amend as a matter of right following this Court's entry of an Amended Scheduling Order. (ECF No. 55.)

2

Just as there are no procedural grounds supporting dismissal of the counterclaims (Counts I, III-VII), MBC also fails to provide this Court with any substantive basis to dismiss them. In particular, MBC fails to show that Crompton's allegations that MBC breached the contract of guaranty (Count II) fails to state a claim. And while the terms of that contact contain various waiver provisions, none serve to bar Crompton from claiming that MBC breached its contractual obligations, or from asserting his defensive claims and independent declaratory judgment claim.

## **RELEVANT PROCEDURAL HISTORY**

MBC filed this action on July 10, 2020.  (ECF No. 1.)  Crompton filed a Motion to Dismiss or, in the Alternative, for a Temporary Stay on August 31, 2020, (ECF No. 21), followed by a Reply in Support dated October 19, 2020. (ECF No. 30.)

Crompton's requests for a stay was on *Burford* abstention grounds, both due to the various overlapping issues and competing interests at stake in the Receivership and because an anticipated sale of QFI's assets for an amount millions greater than the total of MBC's secured claims should resolve this lawsuit. (ECF No. 30 at 7 ("the offer now being considered will be more than sufficient to satisfy all of Quick Fitting's obligations to its secured debtors, including Mueller.").)  At the time, Crompton observed that "Crompton and Quick Fitting have strong, and perhaps compulsory, counterclaims in this lawsuit based on the tortious and injurious actions by Mueller, in addition to affirmative defenses." (ECF No. 21 at 18–20.)  Independently, the Receiver likewise believed it had claims against MBC in the Receivership.

MBC argued against the stay, stating "the controversy here does not implicate the Receivership, nor does the Rhode Island court have jurisdiction to hear and adjudicate this action." (MBC's Opposition to Crompton's Motion to Dismiss or, in the Alternative, for a Temporary Stay filed October 5, 2020 (ECF No. 29 at PageID 321).)

On May 5, 2021, the Court denied Crompton's Motion to Dismiss and declined to apply *Burford* abstention to stay this proceeding. (ECF No. 47 at 8.) As a result, Crompton filed his Answer, Counterclaim and Third-Party Complaint (adding Mueller Industries Inc. ("MLI")) on May 26, 2021. (ECF No. 50.)

On June 3, 2021, the parties filed joint motions to amend the scheduling order (ECF No. 53) and extend the deadline for the Mueller Defendants to respond to Crompton's Answer, Counterclaim and Third-Party Complaint (ECF No. 54), both of which the Court granted on June 4, 2021. (ECF No. 55.) Consistent with the new scheduling order, the Mueller Defendants filed substantially similar motions to dismiss on July 16, 2021. (ECF Nos. 63–64.)

In the meantime, MBC and QFI entered into a settlement in the Receivership in which QFI—out of the $ 23+ MM generated through the sale of QFI's assets, which secured three pieces of secured debt held by MBC—would pay MBC approximately $9.5 MM to resolve its secured and unsecured claims. After a hearing, the Receivership Court approved *only* the aggregate amount of the settlement, rejecting a self-serving allocation proposed by MBC that would have left a deficiency on the second-in-position secured Antipodes Loan, and making no application of settlement proceeds. (ECF No. 66-4 PageID 840 ("ORDER") at ¶ 5 ("Nothing herein, in the Settlement Agreement or in any final judgment hereon, reflects the Receiver's or the Court's position as to, or approval of, Mueller's allocation of the settlement payment … and this Order and the approval of the Court as set forth herein shall constitute an approval and ratification only of the aggregate settlement amount").) Although MBC states throughout its memorandum that the Receivership Court approved the Settlement *Agreement*, (*see, e.g.*, ECF No. 66-1 at 4, 16, 17)— that is false.

4

On August 6, 2021, Crompton filed an Answer, Amended Counterclaim and Third-Party Complaint, (ECF No. 65 ("Am. Countercl.")), which asserts actions by the Mueller Defendants constituting breach of the Antipodes Loan (Count I), breach of the Guaranty (Count II), misrepresentation (Counts III-V), breach of fiduciary duty (Count VI), and Declaratory Judgment (Count VII). (Am. Countercl. ¶¶ 120–171.) The pleading specifically added allegations regarding the second-in-priority secured position of the underlying Antipodes Loan (*Id*. ¶¶ 80–88), MBC's receipt of the $9.5 MM settlement payment resulting in the full satisfaction of the Antipodes Loan (*Id*. ¶¶ 100–118), and a newly pleaded claim for Declaratory Judgment (Count VII) seeking a determination that the underlying loan secured by the Guaranty had been satisfied through the settlement, which would release any payment obligations under the Guaranty. (*Id*. ¶¶ 169–171.)

The Mueller Defendants again moved to dismiss on substantially similar grounds. (ECF Nos. 66–67.) Contemporaneous with the filing of the instant Response in Opposition, Crompton filed a motion for judgment on the pleadings, or, in the alternative, to dismiss on the grounds of mootness on the grounds that the settlement between QFI to MBC satisfies the debt secured by the Guaranty. (ECF No. 70 ("MFJOTP").)  The MFJOTP asserts that MBC cannot show damages for any purported breach of the Guaranty and this lawsuit should be dismissed.

## LEGAL STANDARDS

When evaluating a motion to dismiss under Fed. R. Civ. P. 12(b)(6), a court must determine whether the complaint alleges "sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (citing *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)). A claim (or counterclaim) is plausible on its face if it "pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Iqbal*, 556 U.S. at 678. A court may not grant a motion to dismiss

based upon a disbelief of a complaint's factual allegations. *Lawler v. Marshall*, 898 F.2d 1196, 1199 (6th Cir. 1990).

A Rule 12(b)(6) motion "requires the court to construe the allegations in the complaint in the light most favorable to the plaintiff and accept all the complaint's factual allegations as true." *Slowik v. Lambert*, No. 3:19-CV-00501-DCLC, 2021 WL 1176075, at *2 (E.D. Tenn. Mar. 29, 2021) (citing *Meador v. Cabinet for Human Res.*, 902 F.2d 474, 475 (6th Cir. 1990)). "When an allegation is capable of more than one inference, it must be construed in the plaintiff's favor." *Swanigan v. N'west Sinay v. Lamson & Sessions Co.*, 948 F.2d 1037, 1039-40 (6th Cir. 1991). "Determining whether a complaint states a plausible claim for relief will ... be a context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679.

## SUMMARY OF ARGUMENT

MBC relies largely on procedural arguments to seek dismissal of Crompton's well-pleaded counterclaims (Counts I, III-VI). This Court should readily reject these defective arguments. MBC's additional argument regarding Crompton's breach of guaranty counterclaim (Count II) likewise lack merit—Crompton's allegations are more than sufficient to state a claim.

First, MBC's settlement with QFI's Receiver does not bind Crompton, nor does the Receivership preclude the counterclaims under the doctrine of *res judicata* (or *Rooker-Feldman*). MBC's preclusion argument is based upon a series of false characterizations of (a) its settlement with QFI's Receiver, (b) the Order and Judgment approving the settlement, and (c) issues in that proceeding that the undisputed record shows were neither actually litigated nor capable of being litigated. Most fundamentally, the Receivership Court declined to reach the key question in this case—application of settlement proceeds to MBC's secured debt—leaving it to this Court, and

could not reach QFI's breach of contract and lender liability claims because they were affirmative claims belonging to the Receiver, not Crompton—at least at that juncture—that had been released by the Receiver.

Second, Crompton is not bound by the Settlement Agreement between MBC and QFI, and it consequently does not bar his claims here. Crompton was not a party to that agreement and treating him as bound would ignore the independent nature of the distinct creditor/debtor and creditor/guarantor relationships and the altogether differing natures of the interests involved.

Third, MBC's argument—made essentially in a footnote—that Crompton cannot amend his counterclaim ignores this Court's Amended Scheduling Order and application of the federal rules themselves, which by their own terms grant Crompton leave to amend by right. Even so, MBC has not demonstrated any prejudice flowing from that amendment.

Fourth, Crompton's allegations that MBC breached the Guaranty (Count II) plead all the essential elements of the claim. MBC's argument that Crompton cannot enforce the obligations of his contract—the very thing that makes a contract, a contract—is specious.

## ARGUMENT

MBC principally makes three procedural arguments in support of its motion to dismiss Crompton's counterclaims: "lack of standing, application of res judicata, and untimeliness." (Motion. at 5.) None has merit. Nor has MBC provided this Court with any substantive basis to dismiss any of the counterclaims.

## I.    NEITHER PRECLUSION PRINCIPLES NOR THE RECEIVERSHIP SETTLEMENT AGREEMENT BAR CROMPTON'S COUNTERCLAIMS

### A.  Claim Preclusion (*Res Judicata*) Does Not Apply

The crux of MBC's claim preclusion argument is that Crompton's counterclaims are precluded by events in the Receivership: "Crompton is bound by the Receivership proceedings

because: (1) he directly participated in them, (2) was in privity with Quick Fitting, and (3) the judgment in the Receivership is final."  (ECF No. 66-1 at 16, PageID 814.)  MBC's argument fails because not only is Crompton not in privity with the Receiver, but Crompton's claims are not being "relitigated" here—a fundamental component of a preclusion argument—because not only were the claims never tried in the Receivership, they were not capable of being tried by Crompton in that Proceeding.

1. **Crompton's Counterclaims against MBC (Counts I, III-VI) and seeking Declaratory Judgment (Count VII) Were Not and Could Not Be Litigated in the Receivership Proceeding**

As an initial matter, federal courts must give the same preclusive effect to a state-court judgment as that judgment receives in the rendering state. *Buck v. Thomas M. Cooley L. Sch.*, 597 F.3d 812, 816–17 (6th Cir. 2010); *D'Amario v. Butler Hosp.*, 921 F.2d 8, 10 (1st Cir. 1990) ("The *res judicata* effect of a Rhode Island consent judgment is governed by Rhode Island law."). Under Rhode Island law, the doctrine of *res judicata* applies when "there exists identity of parties, identity of issues, and finality of judgment in an earlier action." *Faye v. Quicken Loans Inc.*, No. 119CV00671MSMPAS, 2020 WL 5258695, at *2 (D.R.I. Sept. 3, 2020) (quoting *Plunkett v. State*, 869 A.2d 1185, 1188 (R.I. 2005)). In deciding the identity of the issues, Rhode Island applies a transactional approach, which "precludes the relitigation of all the issues" from the common nucleus of operative facts "that were tried or might have been tried in the original suit." *Id*. at *3 (quoting *Plunkett*, 869 A.2d at 1188).

a. *Declaratory Judgment Claim (Count VII) concerning the allocation of settlement proceeds*

MBC wrongly contends that Crompton's Declaratory Judgment counterclaim—which seeks a determination on the application of the settlement payment from QFI to MBC's secured debt, including the second-in-priority debt secured by the Guaranty—has already been made in the

Receivership and is therefore barred. (ECF No. 66-1 at 9, n.7 ("Crompton has no standing to challenge the allocation of settlement proceeds and such a claim is barred by res judicata.").)[1] MBC's assertion is both false and disingenuous for three reasons.

First, the allocation issue unquestionably was *not* decided in the Receivership. Instead, the Order approving the settlement makes clear that *no* application of the settlement proceeds took place. (ORDER at ¶ 5 (declining to approve "Mueller's allocation" and stating "approval of the Court … shall constitute an approval and ratification **only** of the aggregate settlement amount") (emphasis added).) The hearing transcript further confirms that the Receivership Court made no application of settlement proceeds. In fact, the Court wanted the record to be clear that it was leaving it to this Court for determination. (May 17, 2021 Hearing Transcript ("Hearing Tr.") at 25:11-14, attached as **Exhibit A** (directing counsel to include specific language in the order "so that you're not litigating in Tennessee the issue of whether this Court has approved that allocation because I am not approving the allocation. I am approving the total settlement."); (Hearing Tr. at 27:13-18 ("I don't know what a judge in Tennessee is going to do so let's make it clear and precise, okay?); Hearing Tr. at 27:22-24 (addressing Crompton's counsel and stating "I know you prefer to litigate this matter here but I don't intend to.").)

---

[1] This duplicitous nature of this statement demonstrates MBC's attempt to have it both ways. On the one hand, MBC argues that Crompton is in privity with the Receiver sufficient to bind him to an agreement to which he is not a party, yet at the same time, MBC argues Crompton does not have a sufficient interest to raise it himself. Given that allocation is the key issue in this case—*e.g.,* if this Court applies payments under the Settlement Agreement as set forth in Crompton's motion for judgment, no payment obligations remain under the Guaranty—it simply is bizarre to believe Crompton does not have standing to raise it, particularly where MBC has conceded this very issue "bears … upon the amount of damages." (ECF No. 66-2 at 14.)

Second, MBC itself has conceded in the Receivership that Crompton is entitled to raise allocation of the settlement proceeds in this ligation. In support of its proposed allocation—which both the Receiver and the Receivership Court rejected—MBC's counsel represented:

> Mueller has two different loans and needs to have this allocation [for tax and accounting purposes], *but the allocation and its impact on Mr. Crompton is not really an issue before the Court today.* **It's an issue that is pending right now in federal court in Tennessee** *regarding Mr. Crompton's liability under that guarantee, and I agree with Mr. Land that to the extent that Mr. Crompton has arguments about that,* **I am sure he will bring them in the appropriate forum** ....

(Hearing Tr. at 21:1-16 (emphasis added).)

Third, MBC likewise argued to this Court when it argued against a stay of the proceedings that Crompton would be entitled to raise the allocation here. MBC explicitly stated that the Receivership lacked jurisdiction over the issues in this case and that the controversy here "does not implicate the Receivership." (ECF No. 29 at PageID 321.)  *Accord Rosen v. E. Rosen Co.*, 818 A.2d 695, 697 (R.I. 2003) (third party's assertion of conjectural, indirect consequences in separate litigation did not establish standing to argue for its own interpretation of sales contract that receiver assigned to buyer in court-approved transaction).

Based upon the foregoing, MBC's motion to dismiss Crompton's declaratory judgment counterclaim must be denied.

### b.   *Crompton's Defensive Counterclaims (Counts I, III-VI)*

MBC also incorrectly contends that Crompton's breach of contract, lender liability and related counterclaims are precluded because they have been finally resolved by the Receivership. According to MBC: "the claims Crompton now raises were—or could have been—brought during that proceeding. (ECF No. 66-1 at 15, PageID 813.) This, too, is false.

It is uncontested that these particular claims were not litigated because the Settlement Agreement between MBC and QFI's Receiver included a release by QFI of its unlitigated,

undecided lender liability claims against MBC. (*See* ECF No. 66-3.) Nor could Crompton have brought any of these claims (defensively) in the absence of the release provided by QFI. In a Receivership action, those (affirmative) claims, of course, belong to the Receiver. *See, e.g.*, *Liberte Cap. Grp., LLC v. Capwill*, 462 F.3d 543, 551 (6th Cir. 2006) ("The receiver's role … is to safeguard the disputed assets, administer the property as suitable, and to assist the district court in achieving a final, equitable distribution of the assets if necessary." (citing 13 *Moore's Federal Practice* ¶¶ 66.02–.03 (3d ed. 1999)). As discussed in detail below, those claims may properly be brought by Crompton later on behalf of QFI, an insolvent debtor, as a defensive setoff to any amounts due under a guaranty because Crompton is not himself bound to the Settlement Agreement and standing for the claims arises from an exception to the general rule (which MBC ignores). *See Wallace Hardware*, *supra*.

Because MBC cannot show counterclaims (Counts I, III-VI) "were tried or might have been tried in the original suit," claim preclusion does not apply. *Plunkett*, 869 A.2d at 1188.

### B. The Settlement Agreement Between MBC and QFI Does Not Preclude Crompton from Bringing His Defensive Claims (Counts I, III-VI) Against MBC

MBC relatedly contends that Crompton's counterclaims are barred by the settlement of MBC's claims with QFI's Receiver and the approval of that settlement by a non-appealable judgment in the Rhode Island court. (Motion, ECF No. 66 at 15–17.) In other words, MBC argues that Crompton essentially released the claims in the settlement—in a settlement agreement to which he was not a party. (ECF No. 66-1 at 16.) This argument requires little comment as it relies on a mischaracterization of the Receivership Court Order, and it is precluded by precedent.

### 1. <u>The Receivership Court did not approve the Settlement Agreement</u>

Throughout its motion, MBC states that the Receivership Court approved the Settlement Agreement itself. (*See, e.g.*, ECF No. 66-1 at 4, 16, 17.) The Receivership Court did not: the Order

makes clear that the Court and its judgment only approved the settlement amount. (ECF No. 66-4, ORDER at ¶ 5.) To the extent MBC is relying upon the *Settlement Agreement* to argue that Crompton's claims are precluded, the state court *judgment* has no bearing on its argument.

### 2.  <u>The release has no preclusive effect because Crompton and QFI are not in privity</u>

Either as a matter of claim preclusion or contract law, QFI's release of liability in the Settlement Agreement does not serve to bind Crompton. (ECF No. 66-1, at 17(contending settlement "was entered into between Quick Fitting's Receiver and Mueller Brass and resolved, for all time, any and all claims related to the Antipodes Loans, which is the debt obligation guaranteed by Crompton.").)   MBC does not dispute that Crompton was not a party to the agreement, but argues that it applies to him no less because QFI's Receiver released QFI's "officers" and Crompton "was in privity with Quick Fitting." (*See* ECF No. 66-1, at 16.)

Leaving aside the fact that Crompton brings his claims here in his individual capacity, when faced with an identical argument that a trustee's release of claims binds a guarantor, the Sixth Circuit squarely rejected it. *See Wallace Hardware*, 223 F.3d at 405. After observing the Trustee would be bound by the release language, the Court explained:

> With respect to the Abrams as guarantors, however, the inquiry is somewhat different. They were not parties to the settlement and, as the District Court recognized, the trustee's interests were not sufficiently aligned with theirs to treat them as bound by the trustee's agreement. [Citation and footnote omitted].  In particular, the trustee did not share the Abrams' direct, personal, and considerable financial incentive to prove that Wallace Hardware breached its contractual obligations to Tri–County. Given this lack of a personal stake in the outcome, the trustee presumably gave more weight to such considerations as the expense of further litigation and the desirability of a speedy resolution to the dispute, and less weight to the potential value of Tri–County's breach-of-contract claims against Wallace Hardware.

*Id*.; *see also id*. ("to allow the guarantors to be bound by the trustee's settlement on behalf of the principal debtor, Tri–County, would ignore the independent nature of the separate creditor/debtor

and creditor/guarantor agreements, and instead convert this 'independence' into a one-way street favoring the creditor").

The same can be said here: the Receiver's interests in settling its disputes with MBC are vastly different than Crompton's interest in proving that MBC's conduct caused significant harm to QFI and had considerable value. And because Crompton lacked privity with QFI's Receiver, neither the Settlement Agreement, nor the Receivership itself, binds Crompton here. *Faye*, 2020 WL 5258695, at *2 (claim preclusion requires "identity of parties" or privity).

### C.  The *Rooker-Feldman* Doctrine Does Not Apply

MBC finally argues that Crompton's counterclaims are barred by *Rooker-Feldman*, a doctrine that precludes district courts from hearing both challenges to state court judgments and claims that are inextricably intertwined with state court judgments. (ECF No. 66-1, at 19.) This doctrine does not apply because the Supreme Court has emphasized the doctrine's narrow reach: "The *Rooker–Feldman* doctrine ... is confined to … cases brought by state-court losers complaining of injuries caused by state-court judgments rendered before the district court proceedings commenced and inviting district court review and rejection of those judgments." *Abbott v. Michigan*, 474 F.3d 324, 330 (6th Cir. 2007) (quoting *Exxon Mobil Corp. v. Saudi Basic Indus. Corp.*, 544 U.S. 280, 284 (2005)).

Here, there is no state court judgment to be complained of by Crompton as the Receivership Court expressly refused to grant or express approval of MBC's allocation and made clear that no litigation of QFI's and Crompton's claims would occur in the Receivership.  (*See supra* at 9.) Given that this Court is not required, nor being requested to, review any decisions made by the Receivership Court, MBC's *Rooker-Feldman* argument has no applicability.

13

## II.   CROMPTON HAS STANDING TO RAISE HIS CLAIMS DEFENSIVELY AS GUARANTOR OF AN INSOLVENT PRINCIPAL

MBC's second procedural argument is that Crompton lacks standing to pursue his counterclaims. (ECF No. 66-1 at 5–9.) MBC goes to great lengths to convince the Court that Crompton's counterclaims are entirely derivative of claims belonging to QFI and therefore he cannot pursue them here. (*See* Motion, ECF No. 66-1, at 6–9.)  MBC's argument (regardless of choice of law) wholly misses the mark because the cases and principle of law MBC rely upon do not apply to defensive, rather than offensive, claims made in the context of dispute against a guarantor, where the guarantor merely seeks an offset of amounts due under the guaranty. *Wallace Hardware*, 223 F.3d at 403 (noting "distinction between affirmative recoveries and defensive set-offs"); *see also Rhode Island Hosp. Trust Nat'l Bank v. Ohio Casualty Ins. Co.*, 789 F.2d 74, 80-81 (1st Cir. 1986) (citing "principles of equity" in holding that a guarantor may assert a defense of the principal debtor).[2]

### A.  Crompton Is Permitted to Raise Claims Defensively Due to the Insolvency of QFI

Although a guarantor typically cannot pursue an affirmative recovery against a creditor by asserting a principal debtor's claims, the guarantor may invoke theories defensively to achieve a set-off against the amount he otherwise would owe to the creditor. *Wallace Hardware*, 223 F.3d

---

[2] *See also Cont'l Grp., Inc. v. Just.*, 536 F. Supp. 658, 661 (D. Del. 1982) (guarantors may assert insolvent borrower's independent claims against creditor as a set-off); *Transportation All. Bank, Inc. v. Arrow Trucking, Co.*, No. 10-CV-016-GKF-PJC, 2010 WL 1727964, at *1 (N.D. Okla. Apr. 27, 2010) (guarantor-counterclaimants entitled to rely on principal debtor's insolvency exception to raise defensively debtor's claims as a possible offset against the creditor's claims on guaranties); *First Texas Serv. Corp. v. Roulier*, 750 F. Supp. 1056, 1061 (D. Colo. 1990) (guarantor permitted to assert lender liability claims defensively against creditor); *Pawnee Petroleum Prod., LLC v. Crawford*, No. 01-1314-WEB, 2003 WL 21659665, at *3 (D. Kan. Apr. 18, 2003) ("While a guarantor may not normally assert claims that belong to his principal, he may use those claims as a set-off against the creditor when the principal is insolvent."); *Clark Car Co. v. Clark*, 48 F.2d 169, 170 (3d Cir. 1931) ("But where there are special circumstances, such as the insolvency of the principal, which would make it inequitable to deny the set-off, it will be allowed.").

at 402 ("[I]t is well established that when the principal is insolvent, the guarantor may set-off the principal's claims against the creditor.") (citation omitted). In arguing that Crompton has no standing, MBC relies upon "the general rule [that] when a creditor sues a guarantor and does not name the principal debtor in the action, the guarantor is not entitled to raise defensively the claims of the principal debtor against the creditor." *Id.*

The Sixth Circuit has explained that "[t]his general rule, however, extends only so far as necessary to serve its purpose, which is 'to protect the claims of the principal, since the guarantor may not be in the best position to assert them.'" 223 F.3d at 402 (quoting *First Texas Serv. Corp. v. Roulier*, 750 F.Supp. 1056, 1060 (D. Colo. 1990)). The rule therefore recognizes several exceptions and provides that "[a] guarantor may assert the independent claim of the principal to set-off the creditor's claim against the guarantor where … the principal is insolvent. *Id.* (quoting *Continental Group., Inc. v. Just.*, 536 F. Supp. 658, 661 (D. Del. 1982)).

Crompton's counterclaims (Counts I, III-VI) expressly invoke this theory by pleading claims that include the notation: "Against MBC defensively by Crompton as guarantor of insolvent principal debtor QFI". (*See* Am. Countercl. Counts I, III–VI, PageID 785, 789–792.) He therefore is entitled to raise them defensively, regardless of whether they are derivative or not.

### B.  The Cases Relied Upon By MBC Are Simply Inapt

None of the cases cited by MBC apply to the circumstances presented here, specifically, where a guarantor asserts claims defensively to obtain a rightful offset of liability. *See, e.g.*, *Saia v. Flying J. Inc.*, No. 16-5853, 2017 WL 6398013, at *2 (6th Cir. July 11, 2017) (direct offensive claim); *Quarles v. City of E. Cleveland* 202 F.3d 269, 1999 WL 1336112 at *4 (6th Cir. 1999) (offensive and did not involve personal guaranty obligations, but rather alleged violations of the Cable Communications Policy Act of 1984); *Mid-State Fertilizer Co. v. Exch. Nat. Bank of Chicago*, 877 F.2d 1333 (7th Cir. 1989) (claim to enforce a guaranty, nor did the guarantor-

15

plaintiffs assert claims defensively; concurrence cautions that guarantors may have standing to bring offensive claims); *VFS Leasing Co. v. J & L Trucking, Inc.*, No. 1:09-CV-2942, 2011 WL 3439525, at *4 (N.D. Ohio Aug. 5, 2011) (offensive claims). As such they provide no basis for dismissal.

## III.   MBC'S UNTIMELINESS ARGUMENT LACKS MERIT

MBC last procedural argument is that Crompton failed to seek leave to amend his original counterclaim. This argument lacks merit, and, in any event, MBC has not demonstrated any prejudice by virtue of the amendment and good cause exists for Crompton to do so.

At the request of the parties, this Court entered an Amended Scheduling Order (ECF No. 55) specifically extending the Mueller Defendants' deadline in which to answer or otherwise respond to Crompton' original counterclaims. That Order did not include a specific deadline for amendment of the pleadings. Crompton then followed federal Rule 15(a), which provides that a party may amend his pleading "once as a matter of course at any time before a responsive pleading is served[.]" Fed. R. Civ. P. 15(a). "Motions to dismiss are not 'responsive pleadings' within the meaning of Rule 15(a)." *Youn v. Track, Inc.*, 324 F.3d 409, 425 n.6 (6th Cir. 2003); *Reyes v. Seaton Enterprises, L.L.C.*, No. 1:07-CV-196, 2008 WL 400452, at *4 (E.D. Tenn. Feb. 12, 2008) ("Defendants have only responded with motions to dismiss … which are not responsive pleadings within the meaning of Rule 15(a). [citing *Youn*] Defendants did not file a responsive pleading before Plaintiffs filed their Amended Complaint, therefore, Plaintiffs could still amend their complaint once as of right.").[3]

---

[3] In a footnote, MBC cites *Leary v. Daeschner*, 349 F.3d 888, 909 (6th Cir. 2003), to argue that Crompton's amendment was defective because first he was required to seek leave. (ECF No. 66-1, at 5 n.4.) That case is distinguishable because in *Leary*, unlike here, the scheduling order included a specific deadline for the filing of amended pleadings, which the plaintiff failed to adhere to.

In any event, to the extent Crompton required leave of Court, he respectfully requests it now. *See* Fed. R. Civ. P. 16(b)(4). "Good cause" exists because after the filing of his original counterclaims, MBC and QFI's Receiver entered into the settlement and wholly altered the legal landscape of this lawsuit, including Crompton's defenses thereto. The amended counterclaims incorporate these new developments and Crompton submits that judicial economy would best be served, should it be necessary, to grant leave to amend *nun pro tunc*.  MBC has not suggested that it would be somehow prejudiced by such relief.

## IV.  CROMPTON'S CLAIM BREACH OF CONTRACT (PERSONAL GUARANTY) (COUNT II) IS WELL PLEADED

In addition to a defensive claim for breach of contract of the Antipodes Loan, which Crompton is entitled to bring, Crompton has asserted a well-pleaded, offensive, direct claim for breach of the Personal Guaranty based on MBC's violations of its obligations, as assignee of the Antipodes Loan (including its Security Agreement).  (Am. Countercl. ¶¶ 134–147.) MBC conflates these two claims in its motion (ECF 66-1, at 12-14), and, moreover, characterizes the breach of guaranty claim as something it is not. In any event, Crompton's allegations are more than sufficient to state a claim of the Guaranty.

### A.  Crompton's Claim Pleads Each Essential Element of a Breach of Contract

#### 1.  <u>Contract</u>

Crompton pleads the existence of a contract to which MBC is a party:  "MBC, by virtue of the assignment, is a party to the Personal Guaranty and has the same contractual obligations as Antipodes." (*Id*. ¶ 135.) Crompton alleges the Antipodes Loan's second-in-priority secured position is an integral term of that contract (*Id*. ¶ 137) and that neither the Antipodes Loan nor the Guaranty allow the creditor to unilaterally subordinate the Antipodes Loan in favor any secured loan or unsecured interest." (*Id*. ¶ 139.)

### 2. **Breach**

Crompton alleges MBC violated the Guaranty by disregarding the Antipodes Loan's second-in-priority secured position and unilaterally subordinating that loan by refusing to apply the Receivership settlement payment proceeds in accordance with the contractual provisions governing its second-in-priority secured position. (*Id.* ¶¶ 135–40.)[4] The claim also alleges MBC unilaterally and impermissibly expanded Crompton's liability beyond the agreed terms and conditions of the Guaranty itself. (*Id.* ¶¶ 140–42.)

This Count therefore is not premised solely on a breach of the implied covenant of good faith and fair dealing, as MBC suggests.[5]  Instead, it is part of Crompton's overall breach of contract claim. *Moore v. Westgate Resorts Ltd., L.P.*, No. 3:18-CV-00410- DCLC, 2020 WL 6814666, at \*22 (E.D. Tenn. Nov. 18, 2020) (citing *Lamar Advert. Co. v. By- Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009)) ("In Tennessee, a duty of good faith and fair dealing is imposed in the performance and enforcement of every contract."); *Westgate Resorts*, at \*22 (covenant's purpose is "(1) to honor the reasonable expectations of the contracting parties and (2) to protect the rights of the parties to receive the benefits of the agreement into which they entered." (citing *Cadence Bank, N.A. v. The Alpha Trust*, 473 S.W.3d 756, 769 (Tenn. Ct. App. 2015)). A breach occurs when "a party to the contract exercises discretion authorized in a contract in an unreasonable way." *Id.* (citing *Universal Properties, Inc. v. Regions Bank*, No. 3:11-CV-538, 2012 WL 4360770, at \*9 (E.D. Tenn. Sept. 21, 2012)).

---

[4] Crompton's MFJOTP discusses each of these documents (and others), including MBC's, QFI's and Antipodes' explicit agreement regarding the order of priority of the loans and how sales of proceeds of QFI's assets would be applied to the various piece of secured debt.
[5] MBC's invocation of New Zealand law on implied duty of good faith is therefore a red herring as Crompton claims independent breaches of contractual provisions.

### 3. **Injury**

Crompton alleges that, as a result of MBC's breach of contract (including, but not limited to, the covenant of good faith and fair dealing), "Crompton has suffered damages, including legal expenses incurred in defending MBC's meritless claim, in an amount to be determined at trial." (*Id.* ¶ 147.)

In sum, Crompton's non-conclusory allegations are more than sufficient to state a claim that is plausible on its face. *Iqbal*, 556 U.S. at 678; *see Lamar Adver. Co. v. By-Pass Partners*, 313 S.W.3d 779, 791 (Tenn. Ct. App. 2009) ("Whether a party acted in good faith is a question of fact."), *perm. app. denied* (Tenn. March 15, 2010).

### B. **MCB Cannot Show Crompton Waived the Right to Claim MBC Violated the Terms of the Guaranty Itself, to Seek a Declaratory Judgment, or to Assert Defensive Claims to Offset Any Potential Liability**

As a last resort, MBC contends that Crompton waived his right to assert his breach of Guaranty counterclaim (and other defensive claims) against MBC. (ECF 66-1, at 17-19.) According to MBC, language in the Guaranty "constitutes a waiver of Crompton's defenses regarding the enforceability of his Personal Guaranty and bars Crompton's claims and defenses here." (*Id.*) MBC's argument fundamentally misconstrues the applicability of that provision on the claims Crompton asserts here.

First, the language in the Guaranty does not waive Crompton's breach of contract claim of the contract itself (here, Count II), in advance of a breach taking place. That would render any Guaranty obligations on the part of Antipodes (and now MBC, as assignee) strictly voluntary, because the breached obligation could never be enforced by Crompton. This contradicts the fundamental nature of a contract, which creates a legally-enforceable agreement between the parties. This Court must reject such a nonsensical reading of the provision.

19

Second, nor does the waiver provision serve to preclude Crompton's declaratory judgment claim (Count VII). That count seeks only to have this Court determine the rights and obligations of the parties by applying the Receivership QFI's settlement payment to secured debt held by MBC. This step is not a claim or a defense against MBC. Instead, it would serve to determine whether any amounts are, in fact, owed on the underlying Antipodes Loan, which MBC admits Crompton's Guaranty secures. (ECF 1, ¶¶ 20, 22.)

Third, the plain language relied upon by MBC also does not cover the other claims Crompton asserts (Counts I, III–VI) because they do not challenge the "enforceability of the Notes" secured by the Guaranty, or the "enforceability of his Personal Guaranty," as MBC argues. To the contrary, Crompton's claims are based on the *validity* of the Notes—which lie at the heart of the Guaranty—and the obligations they entail, as well as that of the Guaranty.

Fourth, likewise, the plain language does not apply because Crompton does not seek "discharge" of his obligations under the Guaranty. Instead, these defensive claims seek to offset any potential amounts (*i.e.*, damages) that might be due under the Guaranty.

In any event, MBC's waiver argument relies on assumptions that contradict Crompton's counterclaim allegations and inferences that must be construed in Crompton's favor. *Swanigan*, 948 F.2d at 1039-40. MBC therefore cannot show at the motion to dismiss stage that Crompton is precluded from asserting his claims as a matter of law.

## **CONCLUSION**

This Court should deny MBC's motion to dismiss in its entirety.

Dated: September 17, 2021

Respectfully submitted,

/s/ Michael J. Sullivan
Michael J. Sullivan (MA No. 487210)
Simon J. Cataldo (MA No. 690879)
*Admitted pro hac vice*
Ashcroft Law Firm
200 State Street, Floor 7
Boston, MA 02109
(617) 573.9400
msullivan@ashcroftlaw.com

Larry Laurenzi (BPR No. 009529)
Sarah Stuart (BPR No. 035329)
Burch, Porter & Johnson, PLLC
130 North Court Avenue
Memphis, Tennessee 38103
(901) 524-5000
llaurenzi@bpjlaw.com
sstuart@bpjlaw.com

*Attorneys for Defendant David Crompton*

## CERTIFICATE OF SERVICE

I hereby certify that a true and correct copy of the foregoing will be served via the Court's ECF system, this 17th day of September, 2021, upon the following counsel of record.

Larry H. Montgomery (TN# 9579)
Aubrey B. Greer (TN# 35613)
6000 Poplar Ave, Suite 400
Memphis, TN 38119
lmontgomery@glankler.com
agreer@glankler.com

/s/ Michael J. Sullivan