# IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF TENNESSEE
## WESTERN DIVISION

| | | |
|---|---|---|
| MUELLER BRASS CO., | ) | |
| | ) | |
| Plaintiff/Counter-Defendant, | ) | |
| v. | ) | |
| | ) | |
| DAVID CROMPTON, | ) | |
| | ) | |
| Defendant/Counter-Plaintiff. | ) | No. 2:20-cv-02496-SHL-atc |
| | | |
| DAVID CROMPTON, | ) | |
| | ) | |
| Third-Party Plaintiff, | ) | |
| v. | ) | |
| | ) | |
| MUELLER INDUSTRIES, INC., | ) | |
| | ) | |
| Third-Party Defendant. | ) | |

## ORDER AWARDING PLAINTIFF/COUNTER-DEFENDANT MUELLER BRASS CO. ATTORNEYS' FEES

Before the Court are Plaintiff Mueller Brass Co.'s ("MBC") Supplemental Brief in Support of its Award of Attorneys' Fees (ECF No. 190) and Defendant David Crompton's response in opposition (ECF No. 191). For the reasons stated below, Mueller Brass is entitled to an award of attorneys' fees in the amount of $457,324.31.

The Court summarized the facts in this case in several of its previous orders (see ECF No. 104 at PageID 1897–1904; ECF No. 163 at PageID 2378–79), so it will not recapitulate them all here. In short, Crompton is the former CEO and majority shareholder of a manufacturing company called Quick Fitting ("QF"). (ECF No. 104 at PageID 1898.) In April 2019, QF obtained a loan from Antipodes, a New Zealand company. (Id.) Then, around August

2019, QF obtained a loan from JP Morgan Chase ("JPMC"). (ECF No. 1 at PageID 4.) Pursuant
to an agreement between QF, Antipodes, and JPMC, Antipodes agreed to subordinating its
priority to JPMC's priority position as to QF's assets. (ECF No. 104 at PageID 1898–99.)
Pursuant to this shift in priorities, Antipodes required Crompton to personally guarantee payment
of the Antipodes Loan, which was worth approximately $2.5 million. (Id. at PageID 1898–99;
ECF No. 1 at PageID 3.) Crompton agreed to the personal guaranty (the "Guaranty
Agreement"), in September 2019, providing that his individual liability "would be 'primary,
direct and immediate,'" to secure repayment of solely the Antipodes' loan. (ECF No. 104 at
PageID 1899 (citation omitted).) The Guaranty Agreement contained a provision that authorized
the collection of attorneys' fees in connection with its enforcement. (ECF No. 1-2 at PageID
63.)

    Fast forward to Spring 2020 and Plaintiff MBC loaned QF $4 million. (ECF No. 104 at
PageID 1899.) At that time, MBC also executed an agreement with Antipodes, JPMC, and QF
that established the following order of priority if QF's assets were to be liquidated: 1) the JPM
loan; (2) the Antipodes loan; and (3) the MBC loan. (Id. at PageID 1899–1900.) Then, MBC
purchased both JPM's and Antipodes' loans. (Id. at PageID 1900.) MBC received Antipodes'
rights under the Guaranty Agreement—that Crompton would be personally liable in case of
default—in connection with the purchase of the loans. (Id.) After QF defaulted on all three
loans, MBC initiated Receivership proceedings in Rhode Island. (Id. at PageID 1901.) While
that litigation was pending, MBC filed an action in this Court for breach of guaranty after
Crompton failed to pay MBC. (ECF No. 1.)

    By December 2020, the Rhode Island litigation had progressed. (ECF No. 104 at PageID
1901.) After the receiver liquidated QF's assets for approximately $18.5 million, MBC

requested an allocation that differed from the loans' previously agreed upon priorities.  (Id. at PageID 1901–02.)  MBC's proposed priority would reduce QF's indebtedness in exchange for a release of liability for potential claims QF had against MBC.  (Id. at PageID 1902–03.)  The Rhode Island court rejected the apportionment sought by MBC, and approved only an aggregate payment of around $9.5 million.  (Id. at PageID 1903.)

In February 2022, this Court issued an Order allowing MBC to proceed under its breach of guaranty claim and seek damages against Crompton, including reasonable attorneys' fees and expenses.  (Id. at PageID 1917.)  After the entry of that Order, the Parties spent roughly a year litigating discovery disputes and Crompton's counterclaims, culminating in cross-motions for summary judgment.  (See ECF Nos. 179–82; 184–87.)  The Court ultimately determined that MBC was entitled to an award of attorneys' fees from Crompton based on the following:

> (1) all of Mueller Brass' attorneys' fees and expenses in enforcing Quick Fitting's NZ Note (ECF No. 1-1 at PageID 16); (2) all of Mueller Brass' attorneys' fees and expenses enforcing Quick Fitting's Yen Note (id. at PageID 23); (3) all of Mueller Brass' attorneys' fees and expenses in pursuing Quick Fitting under the Loan Agreement (id. at PageID 45–46, § 7.02); and (4) all of Mueller Brass' attorneys' fees and expenses in pursuing Crompton under the Personal Guaranty (ECF No. 1-2 at PageID 62–63 ¶¶ 16, 20).

(ECF No. 189 at PageID 3307–08.)[1]  However, because the Court needed additional information to determine the appropriate amount of attorneys' fees to award MBC, it ordered the Parties to file supplemental briefs.  (Id. at PageID 3310–11; ECF Nos. 190–91.)

Based on those filings, the entire record in this matter, and, consistent with the following analysis, Crompton is liable to MBC for $457,324.31 in attorneys' fees and costs.

---

[1] Although litigants typically pay their own attorneys' fees, when, as here, parties include a contractual  provision that provides otherwise, courts enforce those agreements.  See J & B Invs., LLC v. Surti, 258 S.W.3d 127, 138 (Tenn. Ct. App. 2007).

## ANALYSIS

MBC argues that it should receive around $1.3 million in attorneys' fees. It argues that such a figure is reasonable because it is a small fraction of MBC's nearly $10 million in total recovery and because of the "[e]xcellent [r]esults" MBC obtained in both the Rhode Island and Tennessee actions. (ECF No. 190 at PageID 3319, 3324.) Crompton asserts that MBC's recovery should be limited to approximately $116,000, and offers three justifications. (ECF No. 191 at PageID 3634.) First, he argues that the Guaranty Agreement does not authorize an award of attorneys' fees related to securing payment of the non-Antipodes loans. (ECF No. 191 at PageID 3619–21.) Second, Crompton argues that the redactions, block-billing, and vagueness of the legal invoices MBC submitted warrant either a complete disallowance or a substantial reduction in the amount awarded. (Id. at PageID 3623–25.) Finally, Crompton contends that any fees the Court awards should be reduced to be consistent with the rates charged by Memphis-area attorneys. (Id. at PageID 3628–29.)

I.    Fees Available under the Guaranty Agreement

MBC asserts that it spent a little more than $650,000 in attorneys' fees and expenses related to the Rhode Island litigation. (ECF No. 190-7 at PageID 3608.) Crompton argues that because the Guaranty Agreement provides for the recovery of attorneys' fees only in relation to enforcing the Antipodes' loan—one of three loans that formed the basis for the Rhode Island litigation—he should only be responsible for, at most, a third of the costs expended by MBC in the Rhode Island litigation. (ECF No. 191 at PageID 3634.) According to Crompton, this approach is warranted because, as MBC acknowledged,[2] it cannot differentiate between the

---

[2] In its brief addressing the proper attorneys' fees calculation, Crompton notes that MBC's general counsel conceded the following:

expenses it incurred in the Rhode Island litigation in connection with the Antipodes' loan as opposed to the JPM or MBC loans.  (Id. at PageID 3622.)

Under Tennessee law,[3] when a contractual provision awards attorneys' fees, the recovery "is limited to the situation agreed to by the parties in the contract, and the fee provision is subject to the rules of contract interpretation."  To give effect to a contractual provision, the Court must "ascertain the intent of the parties."  In re Holcomb Health Care Servs., LLC, 329 B.R. 622, 651 (M.D. Tenn. 2004), and, in so doing, is guided by unambiguous contract language because it is the best indication of the parties' intent.  Accord Petty v. Sloan, 277 S.W.2d 355, 358 (Tenn. 1955).  The Court will not redraft agreements.  Instead, it will "only enforce the contract which the parties themselves have made."  Holcomb, 329 B.R. at 651 (citing McKee v. Cont'l Ins. Co., 234 S.W.2d 830 (Tenn. 1950)).

Here, a provision of Crompton's Antipodes' Guarantee authorizes an award of attorneys' fees.  (See ECF No. 1-2 at PageID 63.)  That provision states in bold, capital letters, that Crompton, the "guarantor[,] will reimburse the holder of the notes . . . for all expenses . . . including, without limitation, reasonable attorneys' fees," incurred in connection with QF and Antipodes' promissory notes, loan agreement, security documents, or any instrument or agreement securing the notes or the guaranty.  (Id.)  The provision does not include any language

---

I'll tell you that throughout the receivership there wasn't really a denomination in terms  of the work as a claim -- as work being tied to this secured claim or that secured claim. *** So if you're referring to legal spend and legal activity . . . yes, they are three distinct loans. They were not merged in any way, but you cannot segment out fees related to this loan versus this loan.

(See ECF No. 191 at PageID 3622 (quoting ECF No. 178-10 at PageID 2742–43, 2746).)

[3] Despite Crompton's passing reference to New Zealand law (ECF No. 191 at PageID 3620), the Parties apply Tennessee law and cases from this District and other district courts within the Sixth Circuit, without any additional reference to the applicability of New Zealand law. (See, e.g., ECF No. 191 at PageID 3621–22.)  Therefore, the Court applies Tennessee law.

5

imposing liability on Crompton for attorneys' fees expended in connection with the non-Antipodes' loans.  To interpret the Guaranty Agreement as requiring Crompton to pay for attorneys' fees related to loans he did not personally guarantee, as MBC urges, would require the Court to re-write the attorneys' fees provision.

As to the slightly more than $650,000 in attorneys' fees and expenses related to the Rhode Island litigation, Crompton argues that, at most, he should be liable for a third of them.[4] The Court agrees that, because the Rhode Island litigation covered three different loans, but Crompton only guaranteed one of them—that by Antipodes—an initial reduction is warranted. A reduction comports with the contract's plain language and its failure to authorize attorneys' fees incurred in connection with pursuing MBC and JPMC's loans.  (See ECF No. 190-7 at PageID 3608.)  Accordingly, Crompton's liability for the Rhode Island fees is reduced by two-thirds, that is, by $434,347.43, from $651,521.14 to $217,173.71.

In a related argument, Crompton claims that the Guaranty Agreement does not provide for attorneys' fees following the receivership settlement because "MBC's defense expenditures . . . were not incurred to enforce the [Guaranty Agreement] but were necessitated because MBC sought to abuse its position as holder of the Antipodes Notes."  (ECF No. 191 at PageID 3632.) Just as the Court will not rewrite the Guaranty Agreement to allow MBC to recover its attorney's fees related to non-Antipodes loans, it will also not narrow the Guaranty's broad language to allow Crompton to avoid payment of fees related to the Tennessee action.  Crompton, as guarantor, agreed to reimburse the holder of the notes for all expenses, including reasonable

---

[4] There is a slight difference between the amount of attorneys' fees and costs provided in the Petition to Compromise from the Rhode Island receivership and the fees and expenses detailed in MBC's Motion.  The former included the amount of $651,077 (see ECF No. 70-4 at PageID 1065); the latter $651,521.14 (see ECF No. 190-7 at PageID 3608).  The Court relies on the slightly larger figure here, which comes from the filing in this Court.

attorneys' fees, incurred "in connection therewith" the QF and Antipodes' promissory notes, loan

agreement, security documents or any instrument or agreement securing the notes or the

guaranty.  (ECF No. 1-2 at PageID 63.) (emphasis added).

    The phrase "in connection therewith" is broad.  See Trustmark Nat'l Bank v. Redbird

Invs., LLC, 746 F. Supp. 3d 511, 533 (M.D. Tenn. 2024) (collecting cases and noting "the

general truism that courts in a variety of contexts generally consider the term 'in connection

with' to be broad"); see also Firexo, Inc. v. Firexo Grp. Ltd., 99 F.4th 304, 307 (6th Cir. 2024)

(noting that the language "in connection with" was "very broad").

    Here, the phrase "in connection therewith" encompasses attorneys' fees associated with

both MBC's breach of guaranty claim and its defense of Crompton's failed counterclaims.  In

addition to the term's broad import, "had the parties wished to limit the definition . . . [of] 'in

connection,'" nothing prevented them from "clearly do[ing] so."  See Redbird, 746 F. Supp. 3d

at 534.  Had the Parties desired to exclude attorneys' fees for specific parts of litigation, such as

defending against counterclaims, they could have included language to that effect.  Instead, they

agreed to "unambiguously broad" language.  Id.  Because the Court cannot redraft the attorneys'

fees provision, Crompton's argument that MBC's post-Receivership attorneys' fees fall outside

of the Guaranty Agreement cannot be sustained.

    The reduction of $434,347.43 (as described above) from the starting figure of

$1,362,368.11 requested by MBC leaves $928,020.68 left to be considered.  (ECF No. 190-7 at

PageID 3608.)  Crompton's arguments regarding the reasonableness of the fees are considered

below as to that remaining amount.

II.    <u>Reasonableness of the Fees</u>

Under Tennessee law, courts consider the following factors to determine whether

attorneys' fee are reasonable:

> 1. The time devoted to performing the legal service; 2. The time limitations imposed by the circumstances[;] 3. The novelty and difficulty of the questions involved and the skill requisite to perform the legal service properly[;] 4. The fee customarily charged in the locality for similar legal services[;] 5. The amount involved and the results obtained[;] [and] 6. The experience, reputation, and ability of the lawyer performing the legal service.

<u>Devs. Diversified of Tenn., Inc. v. Tokio Marine & Fire Ins. Co.</u>, No. 3:04-cv-00015, 2019 WL

1861322, at *9 (M.D. Tenn. Apr. 25, 2019) (citing <u>Connors v. Connors</u>, 594 S.W.2d 672, 676

(Tenn. 1980); <u>see also</u> <u>In re Hendren</u>, No. 20-24194, 2021 WL 2520193, at *3–4 (Bankr. W.D.

Tenn. Apr. 27, 2021).[5]  Whether a fee is reasonable is a fact-intensive inquiry based on the

particular circumstances of a given case.  <u>Tokio Marine</u>, 2019 WL 1861322, at *9.

---

[5] Additionally, "[c]ourts . . . consider similar factors listed in . . . [Tennessee's] Rule of Professional Conduct 1.5:

> (1) The time and labor required, the novelty and difficulty of the questions involved, and the skill requisite to perform the legal service properly;
> (2) The likelihood, if apparent to the client, that the acceptance of the particular employment will preclude other employment by the lawyer;
> (3) The fee customarily charged in the locality for similar legal services;
> (4) The amount involved and the results obtained;
> (5) The time limitations imposed by the client or by the circumstances;
> (6) The nature and length of the professional relationship with the client;
> (7) The experience, reputation, and ability of the lawyer or lawyers performing the services;
> (8) Whether the fee is fixed or contingent;
> (9) Prior advertisements or statements by the lawyer with respect to the fees the lawyer charges; and
> (10) Whether the fee agreement is in writing.

<u>Tokio Marine</u>, 2019 WL 1861322, at *9 (quoting Tenn. Sup. Ct. R. 8, RPC 1.5).

The party seeking attorneys' fees must show "what a reasonable fee is." Id. This showing typically requires the requesting party to submit "documentation . . . of sufficient detail and probative value to enable the court to determine with a high degree of certainty that such hours were actually and reasonably expended in the prosecution of the litigation." Imwalle v. Reliance Med. Prods., Inc., 515 F.3d 531, 553 (6th Cir. 2008). If the party seeking fees fails to provide adequate documentation, the Court "may reduce the award accordingly." Smith v. Serv. Master Corp., 592 Fed. App'x 363, 371 (6th Cir. 2014).

Crompton focuses on two of the reasonableness factors: (1) the fee customarily charged; and (2) the result obtained by MBC. (See ECF No. 191 at PageID 3628, 3630.) Crompton also argues that a blanket reduction is warranted based on MBC's block-billing, excessive redactions, and vague entries.[6] (Id. at PageID 3623–27.) The Court takes these arguments in turn.

A. Fee Customarily Charged

The Court begins by analyzing the billing of MBC's Rhode Island counsel. Crompton does not dispute the necessity of employing the non-Tennessee counsel in this case, but argues that the hourly rate charged by those firms, which ranged from $875 to $1,750 per hour, must be

---

[6] Crompton makes two additional arguments. First, he argues that MBC's requested attorneys' fees award is unreasonable because MBC failed to mitigate its fees. (ECF No. 191 at PageID 3632.) The argument is, essentially, a reformulation of whether the fee was reasonable, which is addressed in section II.B, below. Second, Crompton argues that the Court should deny MBC's "'fees on fees' [request]—an award of attorneys' fees for seeking attorneys' fees." (Id. at PageID 3634.) Crompton fails to adduce any caselaw or show why a "fees on fees" award is in any way impermissible. To the contrary, courts in the Sixth Circuit commonly award "fees on fees." See Ne. Ohio Coal. for the Homeless v. Husted, 831 F.3d 686, 725 (6th Cir. 2016) (abrogating prior caselaw that limited fees-on-fees award from three to five percent of hours spent litigating underlying claims); see also Carrol v. United Compucred Collections, Inc., No. 1:99-00152, 2008 WL 3001595, at *5–6 (M.D. Tenn. July 31, 2008) (awarding "fees-on-fees"). Crompton's argument as to a fees-on-fees award is unpersuasive.

reduced to the hourly rate charged by local counsel, which ranged from $230 to $395.  (ECF No. 191 at PageID 3628.)

To determine the prevailing market rate, "the Court must initially examine the 'prevailing market rates in the relevant community.'"  Erbel v. Johanns, No. 3:04-CV-555, 2008 WL 11284907, at *9 (E.D. Tenn. Sept. 5, 2008) (quoting Blum v. Stenson, 465 U.S. 886, 895 (1984).  In making this determination, courts routinely "consider 'a party's submissions, awards in analogous cases, state bar association guidelines, and its own knowledge and experience in handling similar fee requests.'"  Mid-Am. Apartment Cmtys., Inc. v. Philipson, No. 2:23-cv-02186, 2024 WL 4654452, at *3 (W.D. Tenn. Nov. 1, 2024) (quoting Van Horn v. Nationwide Prop. and Cas. Ins. Co., 436 F. App'x 496, 499 (6th Cir. 2011)).[7]

Based on the Court's awards in analogous cases, and knowledge and experience in handling similar fee requests, a reduction is warranted to a fee more reflective of the Western District of Tennessee community.  MBC's non-Tennessee counsel's fee is thus reduced to $312.50 per hour, which is the average of $230 and $395, the low and high ends of local counsel's billing rates.  See, e.g., Garcia v. Jac-Co Constr., Inc., No. 2:23-cv-2485, 2024 WL 2806478, at *1 (W.D. Tenn. May 31, 2024) (finding attorney's fee of $400/hr reasonable and in line with market rate in this jurisdiction); G.S. v. Lee, No. 2:21-cv-02552, 2023 WL 7346556, at *3 (W.D. Tenn. Nov. 7, 2023).  Accordingly, the previous starting amount of $928,020.68 is

---

[7] MBC failed to comply with Local Rule 54.1 when it omitted from its motion "an affidavit or declaration of another attorney in the community, who is not otherwise involved with the case, setting out the prevailing rate charged in the community for similar services."  Nevertheless, in the interest of not prolonging the litigation any further, and because the Court has sufficient information to conduct its analysis, MBC will not be required to supplement its filing.

further reduced to $762,207.18, which includes a standardization of MBC's non-Tennessee counsel's hourly rate.[8]

B.  Success on the Merits

MBC argues that it "[o]btained [e]xcellent [r]esults" in both the Rhode Island and Tennessee litigation.  (ECF No. 190 at PageID 3320–22.)  Crompton argues that "a full disallowance of all MBC's requested fees is warranted as to its expenditures after the May 2021 receivership settlement" because "MBC did not achieve any meaningful success."  (ECF No. 191 at PageID 3631.)

 In determining an award of attorneys' fees, district courts in the Sixth Circuit have reduced attorney's fees awards when the party requesting fees obtained only partial success.  See, e.g., Barber v. Louisville & Jefferson Cnty Metro. Sewer Dist., No. 3:05-cv-142-R, 2008 WL 9789629, at *5 (W.D. Ky. Mar. 30, 2007) (reducing award by 25 percent when plaintiff won only $35,000 of $750,000 claimed); Pittington v. Great Smoky Mountain Lumberjack Feud, LLC, No. 3:14-cv-00397, 2017 WL 4270754, at *2 (E.D. Tenn. Sept. 26, 2017) (analyzing success on the merits factor for award of fees that was sixteen times the amount won in the underlying suit and finding it to be excessive).  Because "fees may only be awarded to prevailing parties," any fees "devoted to unsuccessful claims should be subtracted from the number of

---

[8] The following items, added together, make up the reduced total amount:

1) $217,173.71 (the previous total from the receivership litigation);
2) $43,781.25 (140.10 hours billed by Willkie Farr in the Tennessee litigation multiplied by the reduced rate of $312.50/hr);
3) $4,093.75 (13.10 hours billed by Hinckley Allen in the Tennessee litigation multiplied by the reduced rate of $312.50/hr);
4) $476,432.49 (Glankler Brown's fees and expenses in the Tennessee litigation); and
5) $20,725.98 (Dentons Kensington Swan's fees and expenses in the Tennessee litigation).  The Court did not reduce the New Zealand firm's hourly rates because they are similar to Memphis-area rates.

hours reasonably expended on the case as a whole." Priddy v. Fed. Express Corp., No. 03-2664 D/P, 2007 WL 9710175, at *6 (W.D. Tenn. June 8, 2007) (citation omitted). But when a party seeking fees achieves "partial success and the claims on which Plaintiff failed to prevail were unrelated to the claims on which she succeeded, or where Plaintiff did not achieve a degree of success that justified the requested fees[,]" a reduction is appropriate. Doe v. Lee, Nos. 3:16-cv-2862, 3:17-cv-264, 2021 WL 5183874, at *3 (M.D. Tenn. Sept. 30, 2021). However, if a party's claims "are based on a common core of facts or are based on related legal theories . . . the cost of litigating the related claims should not be reduced." Priddy, 2007 WL 9710175, at *6 (quoting Thurman v. Yellow Freight Sys., Inc., 90 F.3d 1160, 1169 (6th Cir. 1996)).

Here, the "success on the merits" factor does not warrant a reduction. The thrust of Crompton's argument is that MBC should not recover for any of the attorneys' fees it expended after May 2021, because that is when MBC "obtained a settlement which fully satisfied the Antipodes Loan." (ECF No. 191 at PageID 3632.) As the court previously noted, much of the post-May 2021 litigation dealt with Crompton's counterclaims and defenses. Despite Crompton's assertions, MBC succeeded in defending against these counterclaims and ultimately prevailed on summary judgment. (See ECF No. 189 at PageID 3299.) In its May 2024 Order, the Court denied Crompton's Motion for Summary Judgment on his counterclaims and granted MBC's Motion for Summary Judgment "as to its claims that Crompton breached his Personal Guaranty, that it is entitled to judgment as to Crompton's defensive claims, and that it is entitled to attorneys' fees and expenses incurred in the Receivership and in this litigation." (Id.) Accordingly, this factor does not weigh in Crompton's favor.[9]

---

[9] This argument also repackages Crompton's assertion that the Guaranty Agreement does not encompass MBC's litigation of Crompton's counterclaims and defenses. As the Court previously noted, the phrase "in connection" is broad enough to encompasses attorneys'

C.  Blanket Reduction

Crompton seeks a reduction based on several alleged deficiencies in MBC's bills,

including arguing for a blanket reduction.  Courts in the Sixth Circuit routinely do apply "across

the board" reductions when a party seeking attorneys' fees submits inadequate billing records.

Aia Eng'g Ltd. v. Magotteaux Int'l S/A, No. 3:09-cv-00255, 2012 WL 13254650, at *9 (M.D.

Tenn. Sept. 28, 2012).  These reductions are appropriate when, for example, billing records

"reflect numerous vague, duplicative, clerical and block billed entries."  Id. (citing Cleveland

Area Bd. of Realtors v. City of Euclid, 965 F. Supp. 1017,1021 n.5 (1997)).  "The documentation

offered in support of the hours charged must be of sufficient detail and probative value to enable

the court to determine with a high degree of certainty that such hours were actually and

reasonably expended in the prosecution of the litigation."  Richard v. Caliber Home Loans, Inc.,

832 F. App'x 940, 947 (6th Cir. 2020) (citation omitted).

MBC attached nearly three hundred pages of bills to its Supplemental Brief in Support of

its Award of Attorneys' Fees.  These entries contain block-billing, persistent redactions, and

vague descriptions.  (See ECF No. 190, Exhibits A–F.)  MBC contends that the billing redactions

are necessary "to avoid waiver of the attorney-client privilege."  (Id. at PageID 3314.)[10]

Crompton argues that, in light of the block-billing, redactions, and vague descriptions contained

in the bills, a blanket reduction is warranted.  (ECF No. 191 at PageID 3624–25.)

---

associated with both MBC's breach of guaranty claim and its defense of Crompton's failed
counterclaims and defenses.

[10] As Crompton argues, at least one district court in the Sixth Circuit has rejected the
argument that "descriptions of work in billing records are protected by the attorney-client
privilege."  (See ECF No. 191 at PageID 3625 (citing Kwik-Sew Pattern Co., Inc v. Gendron,
No. 1:08-cv-309, 2008 WL 8178683, at *1 (W.D. Mich. Sept. 25, 2008)).)

The Sixth Circuit has regularly affirmed across-the-board or blanket fee reductions. See, e.g., Richard v. Caliber Home Loans, Inc., 832 F. App'x 940, 947–48 (6th Cir. 2020) (affirming district court's blanket reduction of 50 percent for billing deficiencies as well as 30 percent deduction for lack of success); Howe v. City of Akron, 705 F. App'x 376, 382–83 (6th Cir. 2017) (affirming across-the-board reduction of 35 percent for "indeterminate entries"). The purpose of an across-the-board reduction is to conserve judicial resources that might otherwise be spent conducting a line-by-line review of vague, redacted, and block-billed entries. Howe, 705 F. App'x at 382–83 ("[I]n assessing fees, district courts are not required to act as 'green-eyeshade accountants' and 'achieve auditing perfection' but instead must simply . . . do 'rough justice.'") (quoting Ne. Ohio Coal. for the Homeless v. Husted, 831 F.3d 686, 703 (6th 2016)); see also Clark v. W. Iris, Transp. Inc., No. 18-168, 2020 WL 2781601, at *6 (E.D. Ky. Feb. 27, 2020) ("[A] court has the discretion to utilize a simple across-the-board reduction by a certain percentage as an alternative to line-by-line reductions, particularly when fee documentation is voluminous.") (citation omitted).

A review of the exhibits MBC submitted in support of its request for attorneys' fees uncovers serious deficiencies. Starting with the assumption that the redacted fees are related to this litigation, the Court is unable to adequately assess the reasonableness of much of the attorneys' fees. The following excerpts from MBC's exhibits illustrate this:





| Research | | 1.20 | 345.00 | 414.00 |
|---|---|---|---|---|
| Legal research re: ███████████████████. | | 2.7 | $2,362.50 |
| Questions about ████████. | | 0.1 | $115.00 |

(ECF Nos. 190-2 at PageID 3383; 190-3 at PageID 3461, 3450.)

These redactions frustrate the Court's ability to determine the reasonableness of the fees charged. For example, without knowing the content of the legal research conducted or the emails sent, the Court cannot adequately assess their reasonableness and/or duplicity. At the same time, some of the bills provided by MBC omit these frustrating redactions:

| Draft first draft of Mueller Industries' Responses Crompton's First Set of Interrogatories and RFPDs; send same to Larry Montgomery for review. | ABG | 1.00 |
|---|---|---|
| Analyze Crompton's Response to our Rule 72 Objection and his newest Motion to Compel, conduct brief research, and draft proposed Response in Opposition to Motion to Compel; Send draft of same to LHM for review | ABG | 1.10 |

(ECF No. 190-4 at PageID 3519, 3541.)

After reviewing the exhibits in this case, and comparing across-the-board reductions in similar cases, the Court finds that a reduction of 40 percent is warranted. In similar circumstances, courts have reduced fees by as much as 75 percent or more. Richard v. Caliber Home Loans, Inc., 832 F. App'x 940, 947–48 (6th Cir. 2020) (imposing total reduction of 80 percent based, in part, on inadequate billing); Clark, 2020 WL 2781601, at *12 (imposing 75 percent reduction for, among other things, inadequately described tasks). Even on the low end, courts routinely impose 25 to 30 percent reductions for deficiencies similar to those shown by

MBC.  See, e.g., Renouf v. Aegis Relocation Co., 641 F. Supp. 3d 439, 452 (N.D. Ohio Nov. 15,

2022) (imposing 35 percent reduction based, in part, on inadequate billing); Hisel v. City of

Clarksville, No. 3:04-0924, 2007 WL 2822031, at *7–8 (M.D. Tenn. Sept. 26, 2007) (imposing

25 percent reduction for deficiencies in billing records).  A 40 percent reduction strikes the

proper balance in this case.  On the one hand, MBC submitted hundreds of pages of vague and

redacted block billing entries.  On the other, MBC ultimately succeeded in this litigation and in

the Rhode Island litigation.  This 40 percent reduction "is a fair and expeditious solution to

determining the sum total of reasonable fees" incurred by MBC.  Saint-Gobain Autover USA,

Inc. v. Xinyi Glass N. Am., Inc., 707 F. Supp. 2d 737, 764 (N.D. Ohio 2010) (citation omitted);

see also Healthcall of Detroit, Inc. v. State Farm Mut. Auto. Ins. Co., 632 F. Supp. 2d 676, 685

(E.D. Mich. 2009) (reducing by 40 percent award for inadequate billing summaries).

A 40 percent reduction applied to $762,207.18 results in MBC being entitled to

$457,324.31 in attorneys' fees and costs.

## CONCLUSION

Consistent with the foregoing, Crompton is liable to MBC for $457,324.31 in attorneys'

fees and costs.

**IT IS SO ORDERED**, this 2nd day of June, 2025.

s/ Sheryl H. Lipman
SHERYL H. LIPMAN
CHIEF UNITED STATES DISTRICT JUDGE